FRANCIS M. GREGOREK (144785)
gregorek@whafh.com
BETSY C. MANIFOLD (182450)
manifold@whafh.com
RACHELE R. RICKERT (190634)
rickert@whafh.com
MARISA C. LIVESAY (223247)
livesay@whafh.com
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
750 B Street, Suite 2770
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile: 619/234-4599

MARK C. RIFKIN (*pro hac vice*)
rifkin@whafh.com
ALEXANDER H. SCHMIDT (*pro hac vice*)
schmidt@whafh.com
MARTIN E. RESTITUYO (*pro hac vice*)
restituyo@whafh.com
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
270 Madison Avenue
New York, NY 10016
Telephone: 212/545-4600
Facsimile: 212/545-4677

Attorneys for Plaintiff Herbert H. Kliegerman

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE APPLE & AT&TM ANTITRUST LITIGATION | ) Master File No. C 07-05152 JW<br>)<br>) |
| ———————————————— | ) File No. C 08-948 JSW<br>) |
| HERBERT H. KLIEGERMAN on behalf of himself and others similarly situated, | ) **AFFIDAVIT OF ALEXANDER H.**<br>) **SCHMIDT IN SUPPORT OF PLAINTIFF** |
| Plaintiff, | ) **KLIEGERMAN'S CROSS-MOTION**<br>) **FOR APPOINTMENT OF INTERIM**<br>) **LEAD CLASS COUNSEL** |
| v. | )<br>) |
| APPLE INC. and AT&T MOBILITY LLC, | ) DATE:      April 7, 2008<br>) TIME:      9:00 a.m. |
| Defendants. | ) CRTRM:   8<br>) JUDGE:   Hon. James Ware |
| ———————————————— | ) |

AFFIDAVIT OF ALEXANDER H. SCHMIDT IN SUPPORT OF PLAINTIFF KLIEGERMAN'S CROSS-MOTION
FOR APPOINTMENT OF INTERIM LEAD CLASS COUNSEL - Master File No. C 07-05152 JW

1    ALEXANDER H. SCHMIDT, being duly sworn, states:

2    1.    I am a member of the Bar of the States of New York and New Jersey, and of the

3    law firm Wolf Haldenstein Adler Freeman & Herz LLP ("Wolf Haldenstein" or "the Firm"). I

4    make this affidavit in support of Plaintiff Kliegerman's cross-motion to appoint Wolf Haldenstein

5    interim lead class counsel in these consolidated actions.

6    2.    Wolf Haldenstein was founded in 1888 and has offices in New York City, San

7    Diego, Chicago, and West Palm Beach, Florida. The firm has more than 50 attorneys and its Class

8    Action Litigation Group consists of 35 attorneys and 10 paralegals. Attached hereto as Exhibit 1

9    is a true and correct copy of Wolf Haldenstein's firm resume, which sets forth the Firm's long and

10    extensive experience and expertise in litigating complex class actions, including large consolidated

11    antitrust class actions.

12    3.    Wolf Haldenstein has vast experience handling antitrust class actions and will best

13    represent the proposed classes in this case. Wolf Haldenstein is recognized nationwide as one of

14    the Country's premier class actions firms and is in a position to dedicate substantial resources to

15    representing the classes. The Firm has successfully litigated numerous Rule 23 class certification

16    motions around the country, including in this District.

17    4.    Wolf Haldenstein has acted as co-lead counsel in several recent antitrust actions,

18    including *In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*, No. M 02-1486-

19    PJH (N.D. Cal.); *McDonough v. Toys "R" Us, Inc.*, No. 06-cv-00242-AB (ED. Pa.); and *In re*

20    *Sulfuric Acid Antitrust Litigation*, No. 03-4576 (N.D. Ill.), and the Firm was appointed as interim

21    class counsel in *In re Elevator Antitrust Litigation*, No. 04-cv-1178-TPG (S.D.N.Y.). Attached

22    hereto as Exhibit 2 for the Court's convenience is a true and correct copy of relevant excerpts of

23    the August 15, 2007 hearing transcript in *In re Dynamic Random Access Memory (DRAM)*

24    *Antitrust Litigation*, No. M 02-1486-PJH (N.D. Cal.).

25    5.    Wolf Haldenstein has also played important roles in numerous other antitrust

26    litigations, including *Elliot Franklin v. Smithkline Beecham Corporation d/b/a GlaxoSmithKline,*

27    *P.L.C., et al.*, CA No. 02-10671-RCL (D. Mass.) (Relafen patent monopolization); *In re Carbon*

28    *Black Antitrust Litigation*, No. 03-CV-10191 (D. Mass.) (horizontal price fixing); *In Re Neurontin*

AFFIDAVIT OF ALEXANDER H. SCHMIDT IN SUPPORT OF PLAINTIFF KLIEGERMAN'S CROSS-MOTION
FOR APPOINTMENT OF INTERIM LEAD CLASS COUNSEL - Master File No. C 07-05152 JW

1   *Antitrust Litigation*, MDL No. 1479 (patent monopolization); *Charles D. Fredericks, Jr. v. Elan*
2   *Corporation, PLC and Skyepharma, Inc. f/k/a Brightstone Pharma, Inc.*, C.A. No. 02-CV-3719
3   (E.D. Pa.) (Naprelan patent monopolization); *In re Infant Formula Antitrust Litigation*, M.D.L.
4   878 (N.D. Fla.) (horizontal price fixing); *In re Brand Name Prescription Drug Antitrust Litigation*,
5   M.D.L. 940 (N.D. Ill.) (same); *In re Cheese Antitrust Litigation*, Case No. 96-C-391 (Circuit Ct.
6   Ill.) (same).

7       6.    I, myself, have had more than 22 years of experience litigating complex
8   commercial matters, including numerous antitrust actions and class actions. I have served as sole
9   plaintiffs' counsel in *Dresses for Less v. The CIT Group/Commercial Services, Inc.*, 2002 U.S.
10  Dist. LEXIS 18338 (S.D.N.Y. Sept. 30, 2002) (group boycott, price-fixing, monopolization in
11  commercial factoring industry), on the team of co-lead counsel in *Schoenbaum v. E.I. DuPont De*
12  *Nemours and Company*, No. 4:05-cv-01108-ERW (E.D. Mo.) (price-fixing of genetically-
13  modified seeds), and as an active steering committee member in *In re Insurance Brokerage*
14  *Antitrust Litigation*, No. 04-5184-MDL (D.N.J.) (market allocation in insurance industry).

15      7.    My partner Mark C. Rifkin, who is also counsel of record in this action, also has
16  substantial experience litigating antitrust and other complex commercial matters. Mr. Rifkin has
17  more than 20 years of experience litigating complex commercial matters, including numerous
18  antitrust and securities class actions in federal and state courts throughout the country. For
19  example, Mr. Rifkin was lead counsel for the consumer class in the *In re Food Additives (High*
20  *Fructose Corn Syrup) Cases*, Master File No. 39693 (Cal. Super. Stanislaus County) and was a
21  member of the Executive Committee in the *In re Travel Agency Commission Antitrust Litig.*, No.
22  4-95-107 (D. Minn.) He has also served as lead counsel in dozens of class actions in state and
23  federal courts across the country, including *In re AST Research Securities Litigation*, No. 94-
24  1370-SVW (C.D. Cal.), which was tried to a jury before the Honorable Steven V. Wilson in the
25  United States District Court for the Central District of California.

26      8.    Wolf Haldenstein has obtained more than $3.7 billion in settlements of antitrust,
27  securities, and consumer class actions where it has served as lead counsel or in some other
28  significant capacity. *See* Exhibit 1 at 31-35.

9.    Wolf Haldenstein is well-positioned to coordinate the discovery, motion practice, pretrial practice, and trial of these class actions. The Firm has already devoted considerable attorney time and resources into researching this case and will continue to do so until the matter is resolved. The Firm has conducted extensive market research and has engaged a leading antitrust economist with extensive telecommunications experience to assist with the prosecution of this case.

10.    Wolf Haldenstein already has engaged in many discussions with counsel for defendants Apple and AT&TM, including discussions pertaining to potential settlement of the litigation.

11.    Wolf Haldenstein has greater resources and far more relevant experience than the other counsel seeking appointment as Interim Lead Class Counsel in this matter.

12.    Accordingly, I respectfully submit that appointment of Wolf Haldenstein as Interim Lead Class Counsel is appropriate.

13.    The procedural history of plaintiff Kliegerman's lawsuit is as follows: Plaintiff is a New York resident who purchased three Apple iPhones on July 29, 2007. Plaintiff brought the first filed case against Apple involving the iPhone on August 27, 2007, in New York state court, which was removed to the Southern District of New York on September 27, 2007. On November 16, 2007, Plaintiff filed an Amended Complaint asserting, *inter alia*, claims under section 2 of the Sherman Act, the Magnuson-Moss Warranty Act, and numerous state consumer protection statutes. A true and correct copy of the Amended Complaint is attached hereto as Exhibit 3.

14.    On January 18, 2008, Defendant Apple, Inc. moved to transfer Plaintiff's action to this Court. On February 5, 2008, Plaintiff consented to the transfer of his action to this Court and to the consolidation of his action with the two similar but later-filed actions already pending and consolidated here under the above-caption.

15.    Attached hereto for the Court's convenience are true and correct copies of the following court opinions:

1.    Exhibit 4:    *Smith v. AON Corp.*, No. 04-cv-6875 (N.D. Ill. May 3, 2005) (Doc. No. 47); and

AFFIDAVIT OF ALEXANDER H. SCHMIDT IN SUPPORT OF PLAINTIFF KLIEGERMAN'S CROSS-MOTION FOR APPOINTMENT OF INTERIM LEAD CLASS COUNSEL - Master File No. C 07-05152 JW    4

1    2.    Exhibit 5:    *In re Copper Tubing Litigation*, No. 04-2771-DV (W.D.

2    Tenn. Feb. 7, 2005) (Doc. No. 56).

3    _____

4    ALEXANDER H. SCHMIDT

5

6    Sworn to before me this
     28th day of February, 2008

7

8    _____

9    Notary Public

10    RACHEL POPLOCK
      Notary Public, State of New York
11    No. 02PO6170764
      Qualified in New York County
12    Commission Expires July 16, 2011

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27    APPLE:15755

28

AFFIDAVIT OF ALEXANDER H. SCHMIDT IN SUPPORT OF PLAINTIFF KLIEGERMAN'S CROSS-    5
MOTION FOR APPOINTMENT OF INTERIM LEAD CLASS COUNSEL - Master File No. C 07-05152 JW

# EXHIBIT 1



FIRM
RESUME

WOLF
HALDENSTEIN
ADLER FREEMAN
& HERZ LLP

# WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP





Founded in 1888, Wolf Haldenstein Adler Freeman & Herz LLP is a full service law firm with practice groups in corporate/tax, pension/benefits, real estate, trusts and estates, healthcare, bankruptcy, limited partnerships, and civil and commercial litigation, with a particular specialty in complex class and shareholder litigation under both federal and state law.

Wolf Haldenstein's total practice approach, supported by the Firm's mid-range size, distinguishes the Firm from other firms. Our longstanding tradition of a close attorney/client relationship ensures that each one of our clients receives prompt, individual attention and does not become lost in an institutional bureaucracy. Our team approach is at the very heart of Wolf Haldenstein's practice. All of our lawyers are readily available to all of our clients and to each other. The result of this approach is that we provide our clients with an efficient legal team having the broad perspective, expertise and experience required for any matter at hand. We are thus able to provide our clients with cost effective and thorough counsel focused on our clients' overall goals.

The Firm has its principal office with lawyers in the various practice areas, at 270 Madison Avenue, New York, NY 10016. The Firm's general telephone number in New York is (212) 545-4600. The fax number in New York is (212) 545-4653. The Firm also has offices at Symphony Towers, 750 B Street, Suite 2770, San Diego, CA 92101, telephone: (619) 239-4599, fax: (619) 234-4599; 55 W. Monroe Street, Suite 1111, Chicago, IL 60603, telephone: (312) 984-0000, fax: (312) 984-0001; and 625 N. Flagler Drive, West Palm Beach, Florida 33401. The Firm's web site is accessible at http://www.whafh.com.

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP

# THE FIRM



Wolf Haldenstein's Class Action Litigation Group has been recognized by courts throughout the country as being highly experienced in complex litigation, particularly with respect to securities, consumer, ERISA, and antitrust class actions and shareholder rights litigation. The Class Action Litigation Group consists of 30 attorneys and 10 paraprofessional assistants. Brief resumes of these attorneys begin on page 13.



Also included are the resumes of attorneys from other areas of the Firm's practice who routinely lend their expertise to the Firm's class action litigators in the areas of tax, bankruptcy, corporate, trusts, labor, and ERISA law. The ability to call upon the internal expertise of practitioners in such varied areas of the law greatly enhances the strength and efficiency of the Firm's representative litigation practice and, indeed, makes Wolf Haldenstein unique among national firms specializing in class action litigation.



The nature of the Firm's activities in representative litigation is extremely broad. In addition to a large case load of securities fraud and other investor class actions, Wolf Haldenstein has represented classes of corn farmers in connection with the devaluation of their crops; contact lens purchasers for contact lens manufacturers' violations of the antitrust laws; merchants compelled to accept certain types of debit cards; insurance policyholders for insurance companies' deceptive sales practices; victims of unlawful strip searches under the civil rights laws; and various cases involving violations of Internet users' on-line privacy rights.

The Firm's experience in class action securities litigation, in particular public shareholder rights under state law and securities fraud claims arising under the federal securities laws and regulations, including the Private Securities Litigation Reform Act of 1995 ("PSLRA"), is particularly extensive. The Firm was one of the lead or other primary counsel in securities class action cases that have recouped billions of dollars on behalf of investor classes, in stockholder rights class actions that have resulted in billions of dollars in increased merger consideration to shareholder classes, and in derivative litigation that has recovered billions of dollars for corporations.

WOLF
HALDENSTEIN
ADLER FREEMAN
& HERZ LLP




Among its colleagues in the plaintiffs' securities bar, as well as among its adversaries in the defense bar, Wolf Haldenstein is known for the high ability of its attorneys, the exceptionally high quality of its written and oral advocacy on behalf of class action clients, and its pioneering efforts in difficult or unusual areas of securities or investor protection laws, including: groundbreaking claims that have been successfully brought under the Investment Company Act of 1940 regarding fiduciary responsibilities of investment companies and their advisors toward their shareholders; claims under ERISA involving fiduciary duties of ERISA trustees who are also insiders in possession of adverse information regarding their fund's primary stockholdings; the fiduciary duties of the directors of Delaware corporations in connection with change of control transactions; the early application of the fraud-on-the-market theory to claims against public accounting firms in connection with their audits of publicly traded corporations; and the application of federal securities class certification standards to state law claims often thought to be beyond the reach of class action treatment.

Wolf Haldenstein's performance in representative litigation has repeatedly received favorable judicial recognition.    The following representative judicial comments over two decades indicate the high regard in which the Firm is held:

- *In Re Dynamic Random Access Memory Antitrust Litigation*, MDL-02-1486 (N.D. Cal.) -- where the Firm was co-lead counsel, Judge Hamilton said (on August 15, 2007), "I think I can conclude on the basis with my five years with you all, watching this litigation progress and seeing it wind to a conclusion, that the results are exceptional.  The percentages, as you have outlined them, do put this [case] in one of the upper categories of results of this kind of [antitrust] class action.  I am aware of the complexity . . . I thought that you all did an exceptionally good job of bringing to me only those matters that really required the Court's attention.  You did an exceptionally good job at organizing and managing the case, assisting me in management of the case.  There was excellent coordination between all the various different plaintiffs' counsel with your group and the other groups that are part of this litigation. . . . So my conclusion is the case was well litigated by both sides, well managed as well by both sides."

4

WOLF
HALDENSTEIN
ADLER FREEMAN
& HERZ LLP





- *In re Comdisco Sec. Litig.*, No. 01 C 2110 (July 14, 2005) -- Judge Milton Shadur observed: "It has to be said . . . that the efforts that have been extended [by Wolf Haldenstein] on behalf of the plaintiff class in the face of these obstacles have been exemplary.  And in my view [Wolf Haldenstein] reflected the kind of professionalism that the critics of class actions . . . are never willing to recognize. . . . I really cannot speak too highly of the services rendered by class counsel in an extraordinary difficult situation."

- *In re MicroStrategy Securities Litigation*, 150 F. Supp. 2d 896, 903 (E.D. Va. 2001) -- where the Firm was a co-lead counsel, Judge Ellis commented: "Clearly, the conduct of all counsel in this case and the result they have achieved for all of the parties confirms that they deserve the national recognition they enjoy."

- *In Re Toys R Us Antitrust Litigation*, 98 MDL 1211 (NG) 191 F.R.D. 347, 351, 356 (E.D.N.Y. 2000) -- where the Firm served as co-lead and liaison counsel, Judge Gershon wrote:  "Class counsel are highly skilled and experienced and can fairly and adequately represent the interests of the class . . . . Counsel for both the class plaintiffs and the States have well-earned the compensation that they request."

- *In Yud v. Saf T Lok*, No. 98-8507-Civ-Hurley (S.D. Fla. Dec. 15, 1999) -- where the Firm was sole lead counsel, the court stated:  "The attorneys have done an outstanding amount of work and fine legal work in a short period of time to bring this class action to resolution in a successful fashion."

- *In Kurzweil v. Philip Morris Companies*, 94 Civ. 2373, 94 Civ. 2546 (MBM) (S.D.N.Y. Nov. 13, 1998) -- where the Firm was sole lead counsel, then Chief Judge Mukasey, in approving a $116.5 million settlement stated:  "In this case, this represents a lot of good, hard, serious work by a lot of talented lawyers and I appreciate it on both sides."

- *In Paramount Communications v. QVC Network Inc.*; In re Paramount Communications Inc. Shareholders' Litigation, 637 A.2d 34, 37 n.2 (Sup. Ct. Del. 1994) -- where the Firm was co-lead counsel for the Paramount shareholders, the Supreme Court of Delaware noted "its appreciation of  . . . the professionalism of counsel in this matter in handling this expedited litigation with the expertise and skill which

WOLF
HALDENSTEIN
ADLER FREEMAN
& HERZ LLP

characterize Delaware proceedings of this nature."  The Court
further "commended the parties for their professionalism in
conducting expedited discovery, assembling and organizing the
record, and preparing and presenting very helpful briefs, a joint
appendix, and oral argument."





- *In re Laser Arms Corp. Securities Litigation,* 794 F. Supp. 475, 496
  (S.D.N.Y. 1989) -- where the Firm was lead counsel, the Court stated
  "plaintiffs' counsel have demonstrated their experience in securities
  litigation and the Court is confident that counsel will proceed
  vigorously on behalf of all class and subclass members."

- *In re Public Service Co. of Indiana Derivative Litigation,* 125 F.R.D. 484,
  486 (S.D. Ind. 1988) -- concerning the construction of the Marble Hill
  Nuclear Power Plant, where the Firm was lead counsel, the court
  said: "Throughout the life of this litigation, it has been both
  vigorously prosecuted and aggressively defended by thoroughly
  competent counsel on all sides."

- *In re Public Service Co. of New Hampshire Derivative Litigation,* 84-220-D
  (D.N.H. 1986) -- involving the construction of the Seabrook Nuclear
  Power Plant, where the Firm was lead counsel, the court said of
  plaintiffs' counsel that "the skill required and employed was of the
  highest caliber."

- *In re Warner Communications Securities Litigation,* 618 F. Supp. 735, 749
  (S.D.N.Y. 1985) -- where the Firm served as co-lead counsel, the court
  noted the defendants' concession that "'plaintiffs' counsel constitute
  the cream of the plaintiffs' bar.'  The Court cannot find fault with that
  characterization."

- *In Steiner v. Equimark Corp.,* No. 81-1988 (W.D. Pa. 1983) -- a case
  involving complex issues concerning banking practices in which the
  Firm was lead counsel, then District Judge Mannsman described, in
  part, the work the Firm performed:

  > We look at the complexity of the issue, the novelty
  > of it, the quality of work that, as the trial judge, I am
  > able to perceive, and then, finally, the amount of
  > recovery obtained: I think I have certainly said a lot
  > in that regard.  I think it's been an extraordinary

WOLF
HALDENSTEIN
ADLER FREEMAN
& HERZ LLP





case. I think it's an extraordinary settlement. Certainly defense counsel and plaintiffs' counsel as well are all experienced counsel with a tremendous amount of experience in these particular kinds of cases. And under those circumstances . . . I think it was, really, the strategy and ingenuity of counsel in dividing up the workload and strategizing the cases as to who was to do what and what ultimately should be done to bring about the settlement that was achieved.

## CURRENT CASES

Wolf Haldenstein is a leader in the class action litigation field and is currently the court-appointed lead counsel, co-lead counsel, or executive committee member in some of the largest and most significant class action lawsuits currently pending across the United States. Wolf Haldenstein attorneys currently serve as lead or co-lead counsel in some of the nation's largest and most significant antitrust class actions, including:

- *In re Evanston Northwestern Healthcare Corp.*, No. 06-4446-JHL (N.D. Ill.). Illegal monopolization and attempted monopolization of relevant market.

- *In re ACR Copper Tubing Antitrust Litigation*, No. 06 CV 2207-D/P (W.D. Tenn.). Horizontal price fixing antitrust litigation. (Lead Counsel).

- *In re McDonough, et al. v. Toys "R" Us, Inc., et al.*, No 2:06 CV 00242-AB (E.D. Pa.) Retail price maintenance antitrust litigation (Lead Counsel).

- *In re Copper Tubing Antitrust Litigation*, No. 04-2771-DV. Horizontal price fixing antitrust litigation. (Lead Counsel).

- *In re Sulfuric Acid Antitrust Litigation*, No. 03-4576, M.D.L. No. 1536 (N.D. Ill.). Horizontal price fixing and market allocation antitrust litigation. (Lead Counsel).

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP

In addition, Wolf Haldenstein attorneys have been involved in the following major antitrust class actions:

- *In re LTL Shipping Services Antitrust Litigation*, M.D.L. 1895 (U.S.D.C. ME). Horizontal price fixing antitrust litigation.

- *In re Rail Freight Fuel Surcharge Antitrust Litigation*, M.D.L. No. 1536 (N.D. Ill.). Horizontal price fixing antitrust litigation.

- *In re Air Cargo Shipping Antitrust Litigation*, No. 06-MD-1775 CBA/VVP (E.D. NY). Horizontal price fixing antitrust litigation.

- *In re International Air Transportation and Surcharge Antitrust Litigation*, No. 06-M-1793 CRB (N.D. CA). Horizontal price fixing antitrust litigation.

- *In re Insurance Brokerage Antitrust Litigation*, No. 04-5184 FSH (U.S.D.C. NJ). Vertical and horizontal market allocation and bid rigging antitrust litigation.

- *In re Publication Paper Antitrust Litigation*, No. 04-MD-1631 SRU (U.S.D.C. Conn.). Horizontal price fixing antitrust litigation.

- *In re New Motors Vehicles Canadian Export Antitrust Litigation*, No. 03 md 1532, M.D.L. No. 1532 (U.S.D.C. Me.). Canadian export antitrust litigation.

- *In re Carbon Black Antitrust Litigation*, No. 03-CV-10191, M.D.L. No. 1543 (D. Mass.). Horizontal price fixing antitrust litigation.

- *In re Rubber Chemicals Antitrust Litigation*, No. C 03 1496 (D. Conn.). Horizontal price fixing antitrust litigation.

- *In re Urethane Antitrust Litigation*, M.D.L. No. 1616. Horizontal price fixing antitrust litigation.

- *In re Plastic Additives Antitrust Litigation*, No. 03 CV 2038, M.D.L. No. 1547 (E.D. Penn.). Horizontal price fixing antitrust litigation.

- *In re OxyContin Antitrust Litigation*, M.D.L. No. 1603. Patent monopolization antitrust litigation.





WOLF
HALDENSTEIN
ADLER FREEMAN
& HERZ LLP





- *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litigation,* No. 3:03 md 1542, M.D.L. No. 1542 (D. Conn.).  Horizontal price fixing antitrust litigation.

- *In re Microcrystalline Cellulose Antitrust Litigation,* MDL 1402.  Horizontal price fixing action.

- *In re Compact Disc Minimum Advertised Price Antitrust Litigation,* M.D.L. No. 1361 (U.S.D.C. Me).  Horizontal and vertical price fixing class action.

- *In re NASDAQ Market-Makers Antitrust Litigation,* MDL No. 1023, (S.D.N.Y.)  (R.W.S. 94 CIV 3996).  Manipulation of market prices.

- *Narendra Patel v. Next Card, Inc., et al.,* United States District Court, Northern District of Eastern Illinois Division, Civil No. 01 C 8409.

- *Elliot Franklin v. Smithkline Beecham Corporation d/b/a GlaxoSmithKline, P.L.C., et al.,* CA No. 02-10671-RCL (D. Mass.).  Relafen patent monopolization class action.

- *In re Neurontin Antitrust Litigation,* MDL No. 1479. Patent monopolization class action.

- *In re Initial Public Offering Antitrust Litigation,* 01 Civ. 2014, (S.D.N.Y.).  Manipulation of market prices.

- *Robert Kapella v. Organon Inc. and Akzo Nobel N.V.,* 2:02 CV 02384, (U.S.D.C. New Jersey).  Patent monopolization litigation.

- *Scott Jacobs v. McNeil-PPC, Inc.,* C.A. No. 02-6797 (E.D. Pa.).  Immodium AD patent monopolization litigation.

- *Joanne Gaddy v. GlaxoSmithKline PLC and Smithkline Beecham Corp. d/b/a GlaxoSmithKline, Inc.,* C.A. No. 02-6707 (E.D. Pa.).  Wellbutrin patent monopolization litigation.

- *Charles D. Fredericks, Jr. v. Elan Corporation, PLC and Skyepharma, Inc. f/k/a Brightstone Pharma, Inc.,* C.A. No. 02 CV 3719 (E.D. Pa.).  Naprelan patent monopolization litigation.

- *Nick Ceh v. U-Haul International, Inc.,* C.A. 02 CV 01977H (S.D. Cal.).  Price fixing antitrust litigation.

9

WOLF
HALDENSTEIN
ADLER FREEMAN
& HERZ LLP

- *Westwood Automotive, Inc. v. Akzo Nobel Coatings, Inc., et al.,* C.A. No. 3:01 CV 435-S (W.D. Ky.). Automotive paint price fixing litigation.

- *In re American Airlines Antitrust Litigation,* Master File No. 99-1187 - JTM (D. Kan.) (pending) (antitrust).

- *In re Visa Check/Master Money Antitrust Litigation,* Master File No. CV-96-5238 (E.D.N.Y.) Horizontal price fixing.

- *In re Bulk Vitamins Antitrust Litigation,* (D.D.C.)

- *In re Clozapine Antitrust Litigation,* (N.D. Ill.)

- *In re Industrial Gas Antitrust Litigation,* 80 C. 3479 and related cases (N.D. Ill.) Horizontal price fixing.

- *In re Aluminum Siding Antitrust Litigation,* M.D.L. No. 454. (D. Minn.) Horizontal price fixing.

- *In re Chor-Alkalai and Caustic Soda Antitrust Litigation,* 86-5428 and related cases (E.D. Pa.) Horizontal price fixing.

- *In re Infant Formula Antitrust Litigation,* M.D.L. 878 (N.D. Fla.) Horizontal price fixing.

- *In re Brand Name Prescription Drug Antitrust Litigation,* M.D.L. 940 (N.D. Ill.) Horizontal price fixing.

- *In re Cheese Antitrust Litigation,* Case No. 96-C-391 (Circuit Ct. Ill.). Horizontal price fixing.

- *In re Commercial Tissue Antitrust Litigation,* M.D.L. 1189 (N.D. Fla.) Horizontal price fixing.

- *In re High Fructose Corn Syrup Antitrust Litigation,* M.D.L. 1087 (C.D. Ill.) Horizontal price fixing).

- *J & J Produce & Deli, Inc., et al. v. Gustafson's Dairy, Inc.,* Civil Action Nos. 93-1077-CIV-T-23B, 93-1264-CIV-T-23A, 94-1437-CIV-T-23A (M.D. Fla.). Horizontal price fixing.

- *In re Flat Glass Antitrust Litigation,* M.D.L. 1200 (W.D. Pa.). Horizontal price fixing.

10

WOLF
HALDENSTEIN
ADLER FREEMAN
& HERZ LLP





Wolf Haldenstein attorneys also currently serve as lead or co-lead counsel in some of the nation's largest and most significant securities class actions, including

- *In re Initial Public Offering Securities Litigation*, 21 MC 92 (SAS) (S.D.N.Y.).

- *J.P. Morgan Chase Securities Litigation, (Blau v. Harrison)*, Civ. No. 04 C 6592 (N.D. Ill.).

- *In re Collins & Aikman Corp. Sec. Litigation*, 06-cv-13555-AJT-VMM (E.D. Mich.).

- *Lewis v. CNL Restaurant Properties*, No. 05-00083-F (Tex. Dist. Ct.).

- *In re Adelphia Communications Corp. Securities and Derivative Litigation* ("Adelphia Business Actions"), 03-ML 1529, 03 CV 5755 (LMM) (S.D.N.Y.).

- *In re Iridium Securities Litigation*, C.A. No. 99-1002 (D.D.C.).

- *In re Transkaryotic Therapies, Inc., Securities Litigation*, C.A. No. 03-10165-RWZ (D. Mass).

- *In re Loral Space & Communications Shareholders' Securities Litigation*, 03 Civ. 8262 (JES) (S.D.N.Y).

- *In re St. Paul Travelers Securities Litigation II*, Civ. No. 04-cv-4697 (JRT/FLN) (D. Minn.).

- *In re LNR Property Corp. Shareholder Litigation*, Consolidated C.A. No. 647-N (Del. Ch. Ct.).

- *In re Triad Hospitals, Inc. Shareholder Litigation*, Case No. 296-00435-07 (Tex. 296th Dist. Ct.).

- *Station Casinos Shareholder Litigation*, Master Case No. A 532367.

- *Swift Transportation Company Shareholder Litigation*, Case No. A519396 (Nev.).

- *In re Harrah's Entertainment Inc. Shareholder Litigation*, Consolidated Class Action No. 2453-N (Del. Ch.).

11





- *In re TXU Shareholder Litigation*, Consolidated Case No. 07-01707 (Tex. 44th Dist. Ct.).

- *In re EGL, Inc. Shareholder Litigation*, Cause No. 2007-00139 (Tex. 125th Dist. Ct.).

- *Clear Channel Shareholder Litigation*, Cause No. 2006-CI-17492 (Tex. 408th Dist. Ct.)

- *In re Tyson Foods, Inc. Consolidated Shareholder Litigation*, Consolidated C.A. No. 1106-N (Del. Ch. Ct.).

- *In re American Pharmaceutical Partners, Inc. Shareholder Litigation*, Consolidated C.A. No. 1823-N (Del. Ch. Ct.).

- *In re Tower Automotive ERISA Litigation*, No. 05 CV 2184 (LLS) (S.D.N.Y.).

- *MBNA Corp. ERISA Litigation*, C.A. No. 05-429 GMN (D. Del.).

- *In re Aon ERISA Litigation*, No. 04 C 6875 (N.D. Ill.).

- *In re Aquila, Inc.*, (ERISA Litigation), 04-865 (W.D. Mo.).

- *Spiziri v. The St. Paul Travelers Companies, Inc.* (ERISA Litigation), Civ. No. 04-5096 JRT/FLN (D. Minn.).

- *In re Harley Davidson, Inc. ERISA Litigation*, Case No. 05-C-00547-CNC (E.D. Wisc).

- *In re Guidant Corp. ERISA Litigation*, 1:05-cv-1009-LJM-TAB (S.D. Ind.)

- *Harris v. Amgen, Inc., et al.*, Case No. CV 07-5442- PSG (C.D. Cal.) (ERISA Action).

- *Schoenbaum v. E.I. DuPont de Nemours and Company, et al.*, Case No. 4:05-cv-01108 ERW (E.D. Mo.) (consolidated antitrust cases concerning genetically modified corn and soybean seeds).

- *In re Genetically Modified Rice Litigation*, MDL 1811 (E.D. Mo.).

- *In re Sulfuric Acid Antitrust Litigation*, Master File No. 03 C 4576 (N.D. Ill.).

12

WOLF
HALDENSTEIN
ADLER FREEMAN
& HERZ LLP





- *In re McDonough, et al. v. Toys "R" Us, Inc., et al.,* No 2:06 CV 00242-AB (E.D. Pa.).

- *In re Copper Tubing Antitrust Litigation,* No. 04-2771-DV.

- *In re ACR Copper Tubing Antitrust Litigation,* No. 06-2207-DP (W.D. Tenn.).

- *In re Evanston Northwestern Healthcare Corp. (ENH) Antitrust Litigation,* No. 07-4446-JHL (N.D. Ill.).

Beginning on page 30 is a representative listing of cases in which the Firm has been lead or one of the plaintiffs' primary counsel and the results achieved in those cases. In addition, a representative list of published decisions in cases in which Wolf Haldenstein has played a lead or other significant role begins on page 29.

## DERIVATIVE CASES

Wolf Haldenstein is a leader in the derivative litigation field and is currently leading counsel in some of the most significant derivative actions pending in the United States, including:

- *In re Mutual Fund Investment Litigation,* MDL No. 1586 (D. Md.).

- *Levin v. Kozlowski, (Tyco Derivative Litigation),* No. 602113/2002 (N.Y. Sup. Ct.).

- *AIG, Inc. Consolidated Derivative Litigation,* C.A. No. 769-N (Del. Chanc.).

- *In re R&G Financial Corp. Derivative Litigation,* 1:05-CV-5547 (S.D.N.Y.).

- *In re Cablevision Systems Corp. Shareholder Derivative Litigation,* Master File No. 06-CV-4130-DGT-AKT.

- *General Motors Derivative Litigation,* MDL Docket No. 1749 (E.D. Mich.).

- *In re Applied Micro Circuits Corp., Inc. Derivative Litigation,* Lead Case No. CV 06-04269 JW (N.D. Cal.).

- *In re Atmel Corp. Derivative Litigation,* Master File No. 06-4592 JF (HRL) (N.D. Cal.).

WOLF
HALDENSTEIN
ADLER FREEMAN
& HERZ L.L.P





- *In re Monster Worldwide, Inc. Stock Option Derivative Litigation*, Master File No. 06cv4622 (S.D.N.Y.).

- *In re Novellus Systems, Inc. Derivative Litigation*, Master File No.  C 06-03514 RMW (N.D. Cal.).

- *In re Verisign, Inc. Derivative Litigation*, Master File No. C-06-4165-PJH (N.D. Cal.).

- *In re Western Digital Corp. Derivative Litigation*, Master File No. SACV 06-729-AG (RNBx) (C.D. Cal.).

- *Teitelbaum v. Cohen*, No. 2833-VCS (Del. Ch.) (*L-3 Communications Holdings, Inc. Derivative action*).

## OVERTIME AND COMPENSATION CLASS ACTIONS

Wolf Haldenstein is a leader in the field of class action litigation on behalf of employees who have not been paid overtime or other compensation they are entitled to receive, or have had improper deductions taken from their compensation. These claims for violations of the federal Fair Labor Standards Act and state labor laws, allege improper failure to pay overtime and other wages, and improper deductions from compensation for various company expenses.  Wolf Haldenstein is currently lead or co-lead counsel, or other similar lead role, in some of the most significant overtime class actions pending in the United States, including those listed below:

- *Lavoice v. Citigroup Global Markets, Inc.*, 06-0756 (S.D.N.Y.)

- *Basile v. A.G. Edwards, Inc.*, 06-cv-0833 (N.D.N.Y)

- *Rosenthal v. A.G. Edwards & Sons, Inc.*, 06-3995 (D.N.J.)

- *Palumbo v. Merrill Lynch*, 06-2104 (E.D.N.Y.)

- *Garrison v. Merrill Lynch*, 06-3553 (D.N.J.)

- *Roles v. Morgan Stanley*, 05-7889 (E.D.N.Y.)

- *Lenihan v. Morgan Stanley*, 06-00794 (D. Conn.)

- *Klein v. Ryan Beck*, 06-03460 (S.D.N.Y.)

- *Badain v. Wachovia*, 06-06321 (W.D.N.Y.)

- *Garcia v. Lowe's Home Centers, Inc.*, Case No. GIC 841120 (S.D. Supr.)

14

- *Weinstein v. MetLife, Inc.*, 06-cv-04444-SI (N.D. Cal.)



## BIOTECHNOLOGY AND AGRICULTURAL LITIGATION



Wolf Haldenstein is a leader in biotechnology and agricultural litigation. The firm has represented U.S. row crop farmers and others harmed by crop supply contamination, price fixing of genetically-modified crop seeds, and false claims and representations relating to purportedly "organic" products. The firm has prosecuted actions in these fields against domestic and international biotechnology and crop science companies under the federal and state antitrust laws, consumer protection and deceptive trade practice statues, and the common law.  As a leader in this field, Wolf Haldenstein pioneered approaches now commonly used in these types of cases, including the use of futures-based efficient market analyses to fashion damages models relating to the underlying commodity crops.  The firm has served or is currently serving as lead or co-lead counsel in some of the most significant biotechnology and agricultural class actions pending in the United States, including:



- *In re StarLink Corn Products Liability Litigation*, MDL No. 1403 (N.D. Illinois) – class action that recovered $110 million for U.S. corn farmers who sustained market losses arising from defendants' contamination of the U.S. food corn supply with an improperly bioengineered corn seed product.

- *Schoenbaum v. E.I. DuPont de Nemours and Company, et al.*, Case No. 4:05-cv-01108 ERW (E.D. Mo.) – Consolidated antitrust cases concerning genetically modified corn and soybean seeds.

- *In Re Genetically Modified Rice Litigation*, MDL 1811 (E.D. Mo.) – Consolidated class actions  representing the interests of United States long-grain rice producers seeking to recover damages they sustained resulting from the contamination of the U.S. rice supply with unapproved, genetically-modified rice seed traits developed and tested by Bayer CropScience LP and related entities.  The website the firm maintains on the case is www.bayerricelitigation.com.

## PRIVATE ACTIONS FOR INSTITUTIONAL INVESTORS

In addition to its vast class action practice, the Firm also regularly represents institutional clients such as public funds, investment funds,

15





limited partnerships, and qualified institutional buyers.  The Firm has represented institutional clients in non-class federal and state actions concerning a variety of matters, including private placements, disputes with investment advisors, and disputes with corporate management.  Examples of such cases include:

- *Steed Finance LDC v. Laser Advisers, Inc.,* 99 Civ. 4222 (PKC)(S.D.N.Y.), a fraud, negligence, breach of contract and breach of fiduciary duty action brought by a hub fund, a related feeder fund and individual investors in the feeder fund against the funds' former investment advisors for mispricing certain securities and derivative instruments in the funds' fixed-income securities portfolio.

- *Diversified Asset Securitization Holdings I, L.P. v. Enterprise Mortgage Acceptance Co, LLC, et al.,* 02 Civ. 10228 (SWK) (S.D.N.Y.), a federal and state securities fraud action brought by limited partnerships that pooled the investments of various insurance companies against the issuer and management and controlling shareholder of the issuer, concerning misrepresentations made in connection with a private placement of certificates representing interests in a securitized pool of loans made to franchise operations of car care businesses, gas stations, convenience stores and quick service restaurants.

- *Gramercy Park Investments v. Airfund International,* No. 97-22734B (Mass.Super. Ct.); *Gramercy Park Investments v. The Krupp Realty Fund,* No. 97-1612 (Mass.Super.Ct.); *Geodyne Resources v. Gramercy Park Investments,* No. CJ-96-05548 (Dist.Ct.Okla.); *Gramercy Park Investments v. Wells Real Estate Fund,* No. 97-A-0241-3 (Ga.Super.Ct.); *Gramercy Park Investments v. Swift Energy,* No. 96-61729 (Dist.Ct.Tex.); and *Lexington Family Investments v. Dean Witter,* No. 15217-96 (N.Y.Sup.Ct.); actions brought on behalf of institutional investors in state courts throughout the nation demanding inspection of investor lists and other corporate and partnership information.

- *Madison Partnership Liquidity Investors v. American Cable TV Investors,* 97 Civ. 4950 (JSM) (S.D.N.Y.); and *Madison Partnership Liquidity Investors v. PLM Equipment Growth Fund,* 98 Civ. 4057 (JSM)(S.D.N.Y.); actions brought on behalf of institutional investors against fund management for improper defensive actions taken in response to investors' acquisitions of large positions in funds.

16

The Firm has also acted as special counsel to investors' committees in efforts to assert the investors' interests without resort to litigation. For example, the Firm served as Counsel to the Courtyard by Marriott Limited Partners Committee for several years in its dealings with Host Marriott Corporation, and as Special Counsel to the Windsor Park Properties 7 and 8 limited partners to insure the fairness of their liquidation transactions.

## THE CLASS ACTION LITIGATION GROUP

The qualifications of the attorneys in the Wolf Haldenstein Litigation Group are set forth below and are followed by descriptions of some of the Firm's attorneys who normally practice outside the Litigation Group who contribute significantly to the class action practice from time to time.

## PARTNERS

**DANIEL W. KRASNER**: *admitted*: New York; Supreme Court of the United States; U.S. Courts of Appeals for the Second, Third, Fourth, Sixth, Eighth, Ninth, Tenth and Eleventh Circuits; U.S. District Courts for the Southern and Eastern Districts of New York, Central District of Illinois, and Northern District of Michigan. *Education*: Yeshiva College (B.A. 1962); Yale Law School (LL.B., 1965). Lecturer: Practicing Law Institute; Rutgers Graduate School of Business. Member: the Association of the Bar of the City of New York; Rockland County, New York State and American Bar Associations; Federal Bar Council. Mr. Krasner has lectured frequently before bar groups and has educated groups on securities laws and investors rights. His qualifications have received favorable judicial recognition on many occasions. *See, e.g., Shapiro v. Consolidated Edison Co.*, [1978 Transfer Binder] Fed. Sec. L. Rep. (CCH) & 96,364 at 93,252 (S.D.N.Y. 1978) ("in the Court's opinion the reputation, skill and expertise of . . . [Mr.] Krasner, considerably enhanced the probability of obtaining as large a cash settlement as was obtained"); *Steiner v. BOC Financial Corp.*, [1980 Transfer Binder] Fed. Sec. L. Rep. (CCH) & 97,656, at 98,491.4, (S.D.N.Y. 1980) ("This Court has previously recognized the high quality of work of plaintiffs' lead counsel, Mr. Krasner"). *The New York Law Journal*, August 1, 1983, at p. 5 (referring to Mr. Krasner as one of the "top rank plaintiffs' counsel" in the securities and class action fields.).

**FRED TAYLOR ISQUITH**: *admitted*: New York; District of Columbia; Supreme Court of the United States; U.S. Courts of Appeals for the First, Second, Third, Fourth and Eighth Circuits; U.S. District Courts for the

WOLF
HALDENSTEIN
ADLER FREEMAN
& HERZ LLP





Southern, Eastern and Northern Districts of New York, District of Arizona, District of Colorado, Central District of Illinois, Western District of Michigan and District of Nebraska. *Education*: Brooklyn College of the City University of New York (B.A., 1968); Columbia University (J.D., 1971). Author, "Post Arbitration Remedies," for an Introduction to Securities Arbitration (NYSBA, 1994); "A Plaintiff's Lawyer Examines Limited Partnership Roll-ups for Real Estate Exit Strategies" (American Conference Institute, 1994); Federal Civil Practice Supplement, "Representative Actions," (NYSBA, 2000). Columnist for weekly column "From the Courts," for *The Class Act*, National Association of Securities and Class Action Attorneys. Lecturer, IPO Tie In/Claims Seminar, Professional Liability Underwriter Society; Securities Arbitration New York State Bar Association; Real Estate Exit Strategies, American Conference Institute; Fundamental Strategies in Securities Litigation (NYSBA, CLE Program). He is an arbitrator with the American Arbitration Association and with the Civil Court of the City of New York and a mediator for the ADR Program of the Supreme Court, County of New York, Complex Litigation Panel. Member: The Association of the Bar of the City of New York (Committee on Federal Courts); New York County Lawyers' Association (Former Chair: Business Tort/Consumer Fraud-Tort Law Section); Brooklyn (Member: Committee on Civil Practice Law and Rules, 1983-; Committees on Legislation and Federal Courts, 1984-), New York State (Member: Committee on Legislation, Trial Lawyers Section, 1981- ); Committee on Securities, Commercial and Federal Litigation Section, 1989- ), and American (Member: Sections on: Litigation; International Law; Individual Rights and Responsibilities) Bar Associations; the District of Columbia Bar; and Legislation and Civil Practice Law and Rules Committee of the Brooklyn Bar Association. Mr. Isquith has been Chairman of the Business Tort/Consumer Fraud Committee of the Tort Law Section of the New York State Bar Association and is a member of that association's Committees on Securities Law and Legislation. He has served as a judge for the Moot Court Competition of Columbia University Law School and Fordham University's National Competition. Mr. Isquith served as President of the National Association of Securities and Commercial Law Attorneys in 2003 and 2004. The April 1987 issue of *Venture* magazine listed Mr. Isquith as among the nation's top securities class action attorneys.

**JEFFREY G. SMITH**: *admitted:* New York; California; Supreme Court of the United States; U.S. Courts of Appeals for the Second, Third, Fourth, Fifth, Sixth, Eighth and Ninth Circuits; U.S. Tax Court; U.S. District Courts for the Southern and Eastern Districts of New York, Southern and Central Districts

WOLF
HALDENSTEIN
ADLER FREEMAN
& HERZ LLP





of California and the Districts of Colorado and Nebraska. *Education*: Vassar College (A.B., *cum laude generali*, 1974); Woodrow Wilson School of Public and International Affairs, Princeton University (M.P.A., 1977); Yale Law School (J.D., 1978). At Yale Law School, Mr. Smith was a teaching assistant for the Trial Practice course and a student supervisor in the Legal Services Organization, a clinical program. Member: The Association of the Bar of the City of New York; New York State and American (Section on Litigation) Bar Associations; State Bar of California (Member: Litigation Section). Mr. Smith has frequently lectured on corporate governance issues to professional groups of Fund trustees and investment advisors as well as to graduate and undergraduate business student groups, and regularly serves as a moot court judge for the A.B.A. and at New York University Law School. Mr. Smith has substantial experience in complex civil litigation, including class and derivative actions, tender offer, merger, and takeover litigation.

**FRANCIS M. GREGOREK**: *admitted*: New York; California; U.S. Courts of Appeals for the District of Columbia and Ninth Circuit; U.S. District Courts for the Eastern and Southern Districts of New York, and Central, Southern and Northern Districts of California; *Education*: University of Virginia (B.A., with high distinction, 1975); New York University (J.D., 1978); Durham University, Durham, England. Phi Beta Kappa; Phi Alpha Theta. Member: State Bar of California; American Bar Association.

**MARY JANE FAIT**: *admitted*: New York; Illinois; U.S. District Courts for the Southern and Eastern Districts of New York, and Northern District of Illinois; U.S. Court of Appeals for the Seventh Circuit. *Education*: St. John's College and University of Illinois (B.A., Economics, 1976); Cornell Law School (J.D., 1979). Member: Chicago Bar Association; Illinois Bar Association; Antitrust Division of the American Bar Association.

**PETER C. HARRAR**: *admitted*: New York; U.S. District Courts for the Southern, Eastern and Northern Districts of New York. *Education*: Princeton University (A.B., with high honors, 1980); Columbia University (J.D., 1984). Phi Beta Kappa. Mr. Harrar has extensive experience in complex securities and commercial litigation on behalf of individual and institutional clients.

**LAWRENCE P. KOLKER**: *admitted*: New York; U.S. Courts of Appeals for the Second and Eleventh Circuits; U.S. District Courts for the Southern and

WOLF
HALDENSTEIN
ADLER FREEMAN
& HERZ LLP





Eastern Districts of New York, Western District of Michigan and the District of Colorado. *Education*: State University of New York at Binghamton (B.A., 1978); Brooklyn Law School (J.D., 1983). Editor, *Brooklyn Law Review*, 1982-1983. Panelist, Early Neutral Evaluator for the Eastern District of New York, 1992-1997. Lecturer, Brooklyn Law School, 1989. Assistant Corporation Counsel, City of New York, 1983-1987. Member: The Association of the Bar of the City of New York; New York State Bar Association. Mr. Kolker has spoken at numerous conferences of the Investment Program Association and the Strategic Research Institute concerning limited partnership tender offers and litigation strategies, and has published articles entitled "Litigation Strategies for Limited Partnership Tender Offers" (February 1996) and "Limited Partnership Five Percent Tender Offers" (October 1997) in Standard & Poor's *Review of Securities and Commodities Regulation*. Mr. Kolker has acted as lead counsel in numerous class and derivative actions asserting the rights of investors since joining Wolf Haldenstein in 1989. Mr. Kolker also counsels investment management firms in transactional and securities matters and represents them in corporate and business litigation.

**MARK C. RIFKIN:** *admitted*: New York; Pennsylvania; New Jersey; U.S. Supreme Court; U.S. Courts of Appeals for the Second, Third, Fifth, and D.C. Circuits; U.S. District Courts for the Southern and Eastern Districts of New York, the Eastern and Western Districts of Pennsylvania, the District of New Jersey, the Eastern District of Wisconsin and the Western District of Michigan. *Education*: Princeton University (A.B., 1982); Villanova University School of Law (J.D. 1985). Contributor, PACKEL & POULIN, *Pennsylvania Evidence* (1987).

Since 1990, Mr. Rifkin has served as lead counsel, co-lead counsel, or trial counsel in many class and derivative actions in securities, ERISA, antitrust, insurance, intellectual property, consumer and mass tort litigation through the country. The securities class and derivative actions include *In re FPL Group Consolidated Litigation*, C.A. No. 90 8461 (S.D. Fla.); *In re Midlantic Corp. Shareholder Litigation*, C.A. No. 90 1275 (D.N.J.); *First Eastern Corp. v. Mainwaring, et al.*, C.A. No. 92 1176 (E.D.Pa.)(where class members recovered 93 percent of their losses); *In re Union Exploration Partners, Ltd.*, No. CV 90 3125 (RSWL)(C.D.Cal.); *U S WEST, Inc. v. MacAllister*, C.A. No. 92 B 1254 (D.Colo.); *Williams v. MGM Pathe Communications Co., et al.*, No. CV 91 3276 HLH (Tx) (C.D.Cal.); and *In re Sun Life Assurance Company of Canada Sales Practices Litigation*. Mr. Rifkin has substantial trial experience as

WOLF
HALDENSTEIN
ADLER FREEMAN
& HERZ LLP

well. He was one of plaintiff's trial counsel in *Upp v. Mellon Bank*, N.A., C.A. No. 91 5229 (E.D.Pa.), where the verdict awarded more than $60 million in damages to the class. Mr. Rifkin was co-lead and principal trial counsel in *In re AST Research Securities Litigation*, No. 94 1370 SVW (C.D.Cal.), a class action which settled after six trial days for $12.5 million.



Mr. Rifkin presently serves as the lead derivative counsel in the *In re Mutual Funds Investment Litigation*, MDL No. 1586 (D.Md.)(arising out of the market timing and late trading scandal), and is actively involved in the *In re Initial Public Offering Sec. Litig.*, Master No. 21 MC 92 (SAS) (S.D.N.Y.)(more than 300 class actions alleging manipulation of the market for IPO stock). In addition, Mr. Rifkin is responsible for the firm's ERISA litigation practice. He presently serves as lead or co-lead counsel in *In re St. Paul Travelers ERISA Litig.*, Civ. No. 04-5096 JRT/FLN (D.Minn), *In re Harley-Davidson ERISA Litig.*, Case No. 05-C-00547-CNC (E.D.Wisc), *In re Tower Automotive ERISA Litig.*, No. 05 CV 2184 (LLS) (S.D.N.Y.), and *In re Guidant Corp. ERISA Litig.*, 1:05-cv-1009-LJM-TAB (S.D.Ind.)



Mr. Rifkin represents a number of institutional investors, including many public and Taft Hartley pension funds and private institutions, in representative and individual securities and shareholder litigation.



Mr. Rifkin lectures frequently to business and professional organizations on a variety of securities, shareholder, and corporate governance matters. Mr. Rifkin is rated "AV" by Martindale-Hubbell, a peer rating that reflects the highest level of professional achievement and ethical conduct.

**MICHAEL JAFFE**: *admitted*: California; New York; U.S. District Courts for the Southern and Eastern Districts of New York. *Education*: University of California at Berkeley (B.S., with highest distinction, 1982); Hastings College of the Law, University of California (J.D., 1987). Judicial Extern to the Honorable Thelton E. Henderson, Northern District of California, 1986-1987. Member: The Association of the Bar of the City of New York. Languages: French.

**BETSY C. MANIFOLD**: *admitted*: Wisconsin; New York; California; U.S. District Courts for the Western District of Wisconsin, Eastern and Southern Districts of New York, and Northern, Central and Southern Districts of California. *Education*: Elmira College; Middlebury College (B.A., *cum laude*, 1980); Marquette University (J.D., 1986); New York University.

WOLF
HALDENSTEIN
ADLER FREEMAN
& HERZ LLP

Thomas More Scholar. Recipient, American Jurisprudence Award in Agency. Member: The Association of the Bar of the City of New York. Languages: French.



ALEXANDER H. SCHMIDT: *admitted:* New York; New Jersey; United States Supreme Court, United States Court of Appeals for the Second Circuit, and the United States Court of Federal Claims. *Education:* State University of New York, Stony Brook (B.A., 1981); Brooklyn Law School (J.D., 1985). Mr. Schmidt concentrates on sophisticated commercial litigation, including matters involving antitrust, class actions, banking, commercial factoring, securities fraud, civil RICO, real estate, intra-corporate and partnership disputes, and legal and accounting malpractice. His noteworthy, groundbreaking successes include *Dresses For Less, Inc. v. CIT Group/Commercial Services, Inc.*, 2002 U.S. Dist. LEXIS 18338; 2002-2 Trade Cas. (CCH) P73,828 (S.D.N.Y. Sept. 30, 2002) (sustaining Sherman Act claims against commercial factoring industry); *Atkins & O'Brien L.L.P. v. ISS Int'l Serv. Sys.*, 252 A.D.2d 446; 678 N.Y.S.2d 596 (1st Dep't 1998) (lawyers could recover future fees under estoppel exception to general rule that client can terminate relationship at any time as lawyers founded law firm and expended start-up costs based on client's promises of future fees); *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 160 F.R.D. 437 (S.D.N.Y. 1995) (attorney client privilege held waived as to inadvertently disclosed documents not protected by "common interest" doctrine). Mr. Schmidt was an Assistant Adjunct Professor of Law at Brooklyn Law School in 1998 and 1999, where he co-taught a seminar on Federal Discovery Practice.



GREGORY M. NESPOLE: *admitted*: New York; U.S. District Courts for the Southern and Eastern Districts of New York. *Education*: Bates College (B.A., 1989); Brooklyn Law School (J.D., 1993). Member: The Association of the Bar of the City of New York; New York State Bar Association. Mr. Nespole's experience includes complex civil and criminal litigation.



DAVID L. WALES: *admitted*: New York; District of Columbia; United States Court of Appeals for the Second and Fourth Circuits, the United States District Courts for the Southern, Eastern and Western Districts of New York, and the District of Columbia. *Education*: State University of New York, Albany (B.A., *magna cum laude*, 1984); Georgetown University Law Center, (J.D., *cum laude*, 1987); Notes and Comments Editor, *Georgetown Journal of Law and Technology*. Mr. Wales is a member of the Federal Bar Council and the Federal Courts Committee of the New York County

WOLF
HALDENSTEIN
ADLER FREEMAN
& HERZ LLP





Lawyers Association, and is AV rated by Martindale Hubbell. Mr. Wales is an experienced trial and appellate attorney who specializes in handling complex securities and class action litigation. Mr. Wales was an Assistant United States Attorney for the Southern District of New York (1992-1998), where he specialized in investigating and prosecuting fraud and white collar criminal cases. Mr. Wales has personally tried more than 15 federal jury trials, and his recent trials include: (i) a jury verdict in May 2005 for more than $11 million, including $1 million in punitive damages, in a derivative action against the general partner of a hedge fund; and (ii) a multi-million dollar settlement with an accounting firm reached during trial of a class action in April 2003. Mr. Wales has been lead or co-lead counsel in numerous securities class actions and derivative actions, including; *In re Sepracor Corp. Securities Litigation*, C.A. No. 02-12338 (D. Mass.) ($52,500,000 recovery in securities fraud class action); *In re Luxottica Group S.p.A. Securities Litigation*, CV-01-3285 (E.D.N.Y.) ($18,250,000 recovery in a Williams Act case); *In re Marque Partners L.P. Derivative Action*, No. 01-604724 (Sup. Ct., N.Y. Co.) ($11,000,000 jury verdict in a derivative action); *In re Jennifer Convertibles Securities Litigation*, CV-94-5570 (E.D.N.Y.) ($9,550,000 recovery, part of the recovery obtained in the middle of trial); and *In re Curative Health Services Securities Litigation*, CV-99-2074 (E.D.N.Y.) ($10,500,000 recovery in a securities fraud action).

**DEMET BASAR**: *admitted*: New York; New Jersey; U.S. District Court for the District of New Jersey, Southern District of New York, and Eastern District of Wisconsin. *Education*: Fairleigh Dickinson University (B.A., *summa cum laude*, 1984), Phi Omega Epsilon; Rutgers University School of Law (J.D., 1990). Recipient, West's Scholarship Award, Senior Notes and Comments Editor, *Rutgers Law Review*. Member: The Association of the Bar of the City of New York. Languages: Turkish.

**ADAM J. LEVITT**: *admitted:* Illinois; Supreme Court of the United States; U.S. Courts of Appeals for the First and Seventh Circuits; U.S. District Courts for the Northern and Southern Districts of Illinois, Northern District of Indiana, District of Nebraska, District of Colorado, and the Northern and Eastern Districts of Texas. *Education*: Columbia College, Columbia University (A.B., *magna cum laude*, 1990); Northwestern University School of Law (J.D., 1993). *Member:* American Law Institute (Members Consultative Groups: Principles of the Law of Aggregate Litigation, the Restatement of the Law (Third) Restitution and Unjust Enrichment, and the Restatement of the Law (Third) Torts: Liability for Economic Loss); Seventh Circuit

WOLF
HALDENSTEIN
ADLER FREEMAN
& HERZ LLP





Contributing Editor, *Class Actions & Derivative Suits* (ABA); Consulting Participant: "Calculation of Securities Litigation Damages" (National Association of Public Pension Attorneys, Securities Litigation Damages Calculation Taskforce). **Publications:** Foreign Investors Serving as Lead Plaintiffs in U.S.-Based Securities Cases, International Practice Section Newsletter (Association of Trial Lawyers of America, Washington, D.C.), Winter 2004 and Spring 2005.; Proposed Rule 225: A Death Warrant for Class Actions in Illinois, 93 Illinois Bar Journal 202 (2005); The Big Business Wish List: Proposed Illinois Supreme Court Rule 225 and the Demolition of Consumer Rights, The Class Act (The Newsletter of the National Association of Securities and Consumer Law Attorneys), February 25, 2005; and An Illinois Lawyer's Guide to Service of Process in Mexico, 82 Illinois Bar Journal 434 (1994). Mr. Levitt has also testified before the Illinois Supreme Court Rules Committee on class action practice and related issues. Mr. Levitt regularly serves as a moot court judge in the Julius H. Miner Moot Court Competition, Northwestern University School of Law. In recognition of his achievements to date, Mr. Levitt was named one of the "40 Illinois Attorneys Under 40 Years Old to Watch" by the *Chicago Daily Law Bulletin* and the *Chicago Lawyer*. He is rated "AV" by Martindale-Hubbell.

Substantially all of Mr. Levitt's practice is focused on complex commercial litigation and class action practice on both the trial and appellate court levels, in federal and state courts nationwide, in the areas of securities, consumer protection, technology, and agricultural law. Since 1993, Mr. Levitt has served as lead counsel, co-lead counsel, or in other leadership positions in numerous class and other complex litigations throughout the United States, including *In re StarLink Corn Products Liability Litigation*, MDL No. 1403 (N.D. Illinois) (recovered $110 million for U.S. corn farmers who sustained market losses arising from defendants' contamination of the U.S. food corn supply with an improperly bioengineered corn seed product); *Court Reporting Services, et al. v. Compaq Computer Corporation*, C.A. No. 02 CV 044 (E.D. Texas) (obtained full recovery, valued at not less than $35 million, on behalf of Compaq Presario purchasers with improperly partitioned hard disk drives); and various Internet privacy cases, including *Supnick v. Amazon.com*, Inc. (W.D. Wash.) and *In re DoubleClick, Inc. Privacy Litigation* (S.D.N.Y.).

Mr. Levitt is currently co-lead counsel in a series of thirteen class action lawsuits against the Monsanto Company, Pioneer Hi-Bred International,

WOLF
HALDENSTEIN
ADLER FREEMAN
& HERZ LLP





and E.I. DuPont de Nemours and Company, predicated upon those companies' alleged improper conduct arising from their sale of genetically-engineered soybean and corn seeds or traits; is Class Counsel in *In re Aon ERISA Litigation* (ERISA class action lawsuit on behalf of all participants and beneficiaries of Aon's 401(k) savings plan against Aon and certain of its officers and directors, alleging that during the class period, defendants, as fiduciaries of the Plan, each violated ERISA by breaching their duties owed to plaintiffs and the other participants and beneficiaries of the Plan in connection with the Plan's holding of Aon stock); and was recently appointed Designated Co-Lead and Co-Interim Class Counsel in *In Re Genetically Modified Rice Litigation*, MDL 1811 (E.D. Mo.), in which he is representing the interests of United States long-grain rice producers seeking to recover damages they sustained resulting from the contamination of the U.S. rice supply with unapproved, genetically-modified rice seed traits developed and tested by Bayer CropScience LP and related entities. Mr. Levitt is also actively involved in the *In re Initial Public Offering Sec. Litig.*, Master File No. 21 MC 92 (SAS) (S.D.N.Y.) (consolidated action against 309 issuers and 55 underwriters alleging manipulation, misrepresentations, and omissions relating to the market for various high-tech initial public offerings), and also recently served as lead counsel in *In re Comdisco Securities Litigation* (securities class action lawsuit against former Comdisco executives relating to Comdisco's misrepresentations and omissions with respect to its Prism division). Mr. Levitt also provides, or has provided legal services to various private companies involving complex litigation and general corporate matters.

THOMAS H. BURT:  *admitted*:  New York; U.S. District Courts for the Southern and Eastern Districts of New York. *Education*: American University (B.A., 1993); New York University (J.D., 1997). Articles Editor with New York University Review of Law and Social Change.

RACHELE R. RICKERT:  *admitted*:  California; U.S. District Court for the Southern District of California. *Education*:  Point Loma Nazarene College (B.A., 1994); University of California, Hastings College of the Law (J.D., 1997). Member: State Bar of California. Former Deputy Alternate Public Defender for the County of San Diego.

WOLF
HALDENSTEIN
ADLER FREEMAN
& HERZ LLP

**ROBERT ABRAMS**: *admitted*: New York; U.S. Court of Appeals for the Third Circuit; U.S. District Courts for the Southern and Eastern Districts of New York, Eastern District of Missouri, District of Maryland, and District of Delaware. *Education:* Haverford College (B.A., 1961); Columbia University (Ph.D., 1966), Brooklyn Law School (J.D., 1992). Woodrow Wilson Fellow; International Business Law Fellow. Adjunct Professor, Mediation Clinic, Brooklyn Law School, 1983-1984. Mr. Abrams was formerly a Professor of Political Science at Brooklyn College and the Graduate Center of the City University of New York. Member: New York State Bar Association. Mr. Abrams is the author of books on the theory of collective choice (Columbia University Press) and voting theory (Sage), as well as articles on Soviet politics, game theory and bargaining and negotiations. He has focused his practice on complex securities, ERISA, and consumer actions.

**ROBERT B. WEINTRAUB**: *admitted*: New York; Supreme Court of the United States; U.S. Court of Appeals for the Federal and Second Circuits; District of Columbia; U.S. District Courts for the Southern and Eastern Districts of New York. *Education*: Syracuse University (B.A., *cum laude*, 1972); Georgetown University Law Center (J.D., 1977). Member: 1975-1977, Articles Editor and Member: Executive Board, 1976-1977, Law and Policy in International Business, *Georgetown International Law Journal*. Assistant Editor, Competition Working Group, "The OECD Guidelines for Multinational Enterprises: A Business Appraisal," 1977. Author, "Law Backs Women Warriors," *National Law Journal*, June 7, 1993. Co-contributor: Chapter 7, "The Celler-Kefauver Act of 1950," 4 *Legislative History of the Federal Antitrust Laws and Related Statutes*, edited by E. Kintner, Chelsea House Publishers, 1980. Mediator, U.S. District Court, Southern District of New York. Member: The Association of the Bar of the City of New York (Member: Committee on Securities Regulation; Council on International Affairs; Chair, 1991-1994 and Member: 1987-1990, Committee on Military Affairs and Justice; International Arms Control and Security Affairs, 1990-1991); and American Bar Association. He has counseled corporations on contract negotiation and antitrust matters, and provided antitrust advice on mergers to the arbitrage department of a major brokerage house. He has served as an arbitrator for the NYSE, the NASD and the Municipal Securities Rulemaking Board and as a mediator for the federal District Court in New York. Mr. Weintraub also previously served as Senior Vice President and General Counsel of a broker-dealer investment bank which is a member of the NYSE, the NASD and other principal exchanges. Mr.

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP





Weintraub has particular experience in litigation involving investment firms and broker-dealers.

**GUSTAVO BRUCKNER**: *admitted*: New York; New Jersey; United States District Courts for the Districts of New Jersey, Eastern District of New York, and the Southern District of New York; the United States Court of Appeals for Second Circuit and the Supreme Court of the United States. *Education*: New York University (B.S., 1988); New York University (M.B.A. 1989); Benjamin N. Cardozo School of Law, Yeshiva University (J.D., 1992).

## ASSOCIATES

**THEODORE B. BELL**: *admitted*: Michigan; Illinois; 7th Circuit Court of Appeals; United States District Courts for the Northern, Central and Southern Districts of Illinois. *Education*: University of Michigan (B.A., 1988); University of Detroit Mercy School of Law (J.D., 1992).

**SCOTT J. FARRELL**: *admitted*: New York; New Jersey; U.S. District Courts for the Southern and Eastern Districts of New York, the District of New Jersey, and the District of Colorado. *Education*: Yeshiva University (B.A., *magna cum laude*, 1996), where he was a Max Stern Scholar and Gruss Scholar; New York University School of Law (J.D., 1999), where he was an Article and Note Editor of the *Journal of Legislation and Public Policy*. He is the co-author of "In re Gary Glass and Zoltan Guttman," CFTC Docket No. 93-4, *Futures & Derivatives Law Report*, July/August, 1998.

**KATE MCGUIRE**: *admitted*: New York; U.S. District Courts for the Southern and Eastern Districts of New York. *Education*: University of California at Santa Cruz (B.A. 1995), Georgetown University Law Center (J.D., 1998); Member: *Georgetown Immigration Law Journal*.

**STACEY T. KELLY**: *admitted*: New York; New Jersey; U.S. District Courts for the Southern and Eastern Districts of New York. *Education*: New York University (B.A., 1997); Rutgers School of Law - Newark (J.D., 2000). Member: New York State Bar Association; New York County Lawyers Association

**PAULETTE S. FOX**: *admitted*: New York; New Jersey U.S. District Courts for the Southern and Eastern Districts of New York. *Education*: Benjamin

27

N. Cardozo School of Law (J.D. 2001); Syracuse University (B.A. in Public Policy, *summa cum laude*, Phi Beta Kappa, 1998).

**MATTHEW GUINEY**: *admitted*: New York.  *Education*: The College of William & Mary (B.A. in Government and Economics 1998); Georgetown University Law Center (J.D. 2002).

**MARTIN RESTITUYO**: *admitted*: New York. *Education*: Queens College (B.A., 1998); Hofstra University School of Law (J.D. 2002); Hofstra University, Frank G. Zarb School of Business (M.B.A., Finance, 2005).  Mr. Restituyo did postgraduate work at the Universidad Autonoma de Santo Domingo, Santo Domingo, in the Dominican Republic, and studied at Faculte de Droit de l'Universite de Nice, in Nice, France.  Mr. Restituyo was the Assistant Town Attorney for North Hempstead, New York (2004-2006), an Adjunct Professor at John Jay College of Criminal Justice (2005), and was in the Nassau County Department of Economic Development (2002-2004).  In 2003, he was awarded the "Distinguished Alumni Award" from Hofstra University's Clinical Program.  He is a member of the Nassau County Bar Association, the Women's Bar Association, the Hispanic Bar Association, the Dominican Bar Association and Hofstra University School of Law, Alumni Board.

**MARISA C. LIVESAY**: *admitted*:  California; U.S. Court of Appeals for the Ninth Circuit; U.S. District Courts for the Central, Southern and Northern Districts of California. *Education*:  University of Arizona (B.A. 1999, Dean's List with Distinction), where she served on the Associated Student Senate; University of California, Los Angeles (J.D. 2002, Corporate Specialization), where she was a member of the Moot Court Executive Board and staff member of the Journal of International Law and Foreign Affairs.  Member: State Bar of California.

**IONA M. EVANS**: *admitted*: New York. *Education*: University of New Hampshire (B.A., 1999); Boston University School of Law (J.D., 2004), where she served as Staff Writer and Business Editor on the *International Law Journal*.

**GEORGE T. PETERS**: *admitted*: New York, U. S. District Courts for the Southern & Eastern Districts of New York.  *Education:* Eastern Illinois University, B.A. 1991; attended Howard University School of Law and





28

fulfilled remaining law studies at Wolf Haldenstein Adler Freeman and Herz LLP. Member of the New York State Bar Association.

**RACHEL S. POPLOCK:** ***admitted:*** New York, U.S. District Courts for the Southern & Eastern Districts of New York. ***Education:*** Cornell University (B.S. Human Development, 2002), Fordham Law School (J.D. 2005) where she was a member of the Fordham Urban Law Journal and received the Archibald R. Murray Public Service Award for her participation in the Family Advocacy Clinic.

## WOLF HALDENSTEIN PARTNERS WHO REGULARLY PROVIDE THEIR NON-LITIGATION EXPERTISE TO CLASS ACTION LITIGATION MATTERS

**CHARLES H. BALLER**: ***admitted***: New York. ***Education***: New York University (B.S., *magna cum laude*, 1954); Columbia University (LL.B., 1957); New York University (L.L.M., Taxation, 1962). Beta Gamma Sigma; Beta Alpha Psi. Harlan Fiske Stone Scholar. Co-Editor and Contributing Author, April, 1981, with 1986 Supplement, *Business Acquisitions*, Practicing Law Institute. Member: The Association of the Bar of the City of New York; New York State and American Bar Associations. Mr. Baller has worked in the office of Chief Counsel, Internal Revenue Service (Interpretative Division). A lecturer and author for the Practicing Law Institute (co-editor of the reference work *Business Acquisitions: Planning and Practice*), Mr. Baller is a corporate and tax attorney with extensive expertise in mergers and acquisitions, complex estate planning (particularly relating to corporate and business holdings), and employee benefits and compensation, including ERISA.

**ERIC B. LEVINE**: ***admitted***: New York; U.S. Courts of Appeals for the Second and Eleventh Circuits; U.S. District Courts for the Southern and Eastern Districts of New York, and Eastern District of Michigan; U.S. Tax Court. ***Education***: State University of New York at Buffalo (B.A., *summa cum laude*, 1974); University of Pennsylvania (J.D., *cum laude*, 1977). Order of the Coif, Phi Beta Kappa. Associate Editor, *University of Pennsylvania Law Review*, 1976-1977. Member: The Association of the Bar of the City of New York; New York State Bar Association. Mr. Levine's practice focuses on complex commercial and civil litigation, including in the area of bankruptcy and receivership litigation, creditors' rights, and lender liability.

**MARK C. SILVERSTEIN**: *admitted*: New York. *Education*: State University of New York at Binghamton (B.S., *summa cum laude*, 1980); New York University (J.D., *cum laude*, 1983). Order of the Coif. Editor, Journal of International Law and Politics, 1982-1983. Member: the Association of the Bar of the City of New York; New York State; American Bar Associations. Mr. Silverstein serves as general counsel to corporations and handles matters involving tax planning and mergers and acquisitions. He also provides counseling in the structure of complex settlements and the administration of complex claims administrations.

**ELI D. GREENBERG**: *admitted*: New York. *Education*: New York University (B.S., *magna cum laude*, 1981. New York University (J.D., 1984). Beta Gamma Sigma. Lecturer, New York University. Member: American Health Lawyers Association. Mr. Greenberg has extensive experience in pension, tax, benefits, and ERISA.





### SUBSTANTIAL RECOVERIES OBTAINED IN REPRESENTATIVE PAST CLASS ACTION CASES IN WHICH WOLF HALDENSTEIN WAS LEAD COUNSEL OR HAD ANOTHER SIGNIFICANT ROLE

- *In re Brand Name Prescription Drug Antitrust Litigation*, MDL No. 940 (N.D. Ill.)(class recovered $715 million).

- *In re BankAmerica Corp. Securities Litigation*, MDL Docket No. 1264 (JFN) (E.D. Mo.) (class recovered $490 million).

- *In re Dynamic Random Access Memory Antitrust Litigation*, (MD-02 1486 (N.D. Cal.) (class recovered $325 million).

- *In re Paine Webber Limited Partnerships Litigation*, 94 Civ 8547 (S.D.N.Y.) (class recovered $200 million).

- *In re Relafen Antitrust Litigation*, No. 01-12239-WGY (D. Mass.)(class recovered $175 million).

- *In re MicroStrategy, Inc. Securities Litigation*, Civ. No. 00-473-A (E.D. Va.) (class recovered $160 million in cash and securities).

- *In Computer Associates 2002 Class Action Sec. Litigation*, 2:02-CV-1226 (E.D.N.Y.) ($130 million settlement in this and two related actions).

- *In re Infant Formula Antitrust Litigation,* (N.D. Fla.)(class recovered $126 million).



- *Kurzweil v. Philip Morris Cos.,* 94 Civ. 2373, 94 Civ. 2546 (S.D.N.Y.) (securities fraud) (class recovered $116.5 million in cash).



- *In re Starlink Corn Products Liability Litigation,* (N.D. Ill.) (class recovered $110 million).

- *In re Chubb Corp. Drought Insurance Litigation,* C-1-88-644 (S.D. Ohio) (class recovered $100 million).



- *In re Flat Glass Antitrust Litigation,* MDL No. 1200 (W.D. Pa.)(class recovered $61.7 million).

- *In re Chor-Alkalai and Caustic Soda Antitrust Litigation,* (E.D. Pa.) (class recovered $55 million).

- *In re Industrial Gas Antitrust Litigation,* (N.D. Ill.)(class recovered $50 million in cash and coupons).

- *Holloway v. Peat, Marwick, Mitchell & Co.,* No. 84 C 814 EU (N.D. Okla.)(class recovered $38 million).

- *In re Sepracor Inc. Securities Litigation, Civ. No.* 02-12338 (MEL) (D. Mass.) (classes recovered $52.5 million),

- *In re Merrill Lynch & Co., Inc. Global Technology Fund Securities Litigation,* 02 CV 7854 (JFK) (SDNY); and *In re Merrill Lynch & Co., Inc. Focus Twenty Fund Securities Litigation,* 02 CV 10221 (JFK) (SDNY) (class recovered $39 million in combined cases).

- *In re CNL Hotels & Resorts, Inc. Securities Litigation,* No. 6:04-cv-1231 (Orl-31) (class recovered $35 million, and lawsuit also instrumental in $225 million benefit to corporation).

- *Berger v. Compaq Computer Corp.,* Docket No. 98-1148 (S.D. Tex.) (class recovered $29 million).

- *In re Arakis Energy Corporation Securities Litigation,* 95 CV 3431 (E.D.N.Y.) (class recovered $24 million in cash).

31

WOLF
HALDENSTEIN
ADLER FREEMAN
& HERZ LLP





- *In re E.W. Blanche Holdings, Inc. Securities Litigation*, Civ. No. 01-258 (D. Minn.) (class recovered $20 million).

- *In re Globalstar Securities Litigation*, Case No. 01-CV-1748 (SHS) (S.D.N.Y.) (class recovered $20 million).

- *In re Luxottica Group S.p.A. Securities Litigation*, No. CV 01-3285 (E.D.N.Y) (class recovered $18.25 million).

- *In re Musicmaker.com Securities Litigation*, CV-00-2018 (C.D. Cal.) (class recovered $13.75 million).

- *In re Comdisco Securities Litigation*, No. 01 C 2110 (MIS) (N.D. Ill.) (class recovered $13.75 million).

- *In re Acclaim Entertainment, Inc., Securities Litigation*, C.A. No. 03-CV-1270 (E.D.N.Y.) (class recovered $13.65 million).

- *In re Concord EFS, Inc. Securities Litigation*, No. 02-2097 (MA) (W.D. Tenn) (class recovered $13.25 million).

- *In re Bausch & Lomb, Inc. Securities Litigation*, 01 Civ. 6190 (CJS) (W.D.N.Y.) (class recovered $12.5 million).

- *In re Allaire Corp. Securities Litigation*, 00-11972 (D. Mass.) (class recovered $12 million).

- *Bamboo Partners LLC v. Robert Mondavi Corp.*, No. 26-27170 (Cal. Sup. Ct.) (class recovered $10.8 million).

- *Curative Health Services Securities Litigation*, 99-2074 (E.D.N.Y.) (class recovered $10.5 million).

- *City Partnership Co. v. Jones Intercable*, 99 WM-1051 (D. Colo.) (class recovered $10.5 million).

- *In re Tenfold Corporation Securities Litigation*, 2:00-CV-652 (D. Utah) (class recovered $5.9 million).

- *In re Realogy Corp. Shareholder Litigation*, No. 2621-N (Del. Ch.).

- *In re Industrial Gas Antitrust Litigation*, 80 C 3479 and related cases (N.D. Ill.) (class recovered $50 million in cash and coupons).

WOLF
HALDENSTEIN
ADLER FREEMAN
& HERZ LLP





- *In re Chor-Alkalai and Caustic Soda Antitrust Litigation*, 86-5428 and related cases (E.D. Pa.) (class recovered $55 million).

- *Landon v. Freel*, M.D.L. No. 592 (S.D. Tex.) (class recovered $12 million).

- *Holloway v. Peat, Marwick, Mitchell & Co.*, No. 84 C 814 EU (N.D. Okla.) (class recovered $38 million).

- *In re The Chubb Corp.* Drought Insurance Litigation, C-1-88-644 (S.D. Ohio) (class recovered $100 million.).

- *Wong v. Megafoods*, Civ-94-1702 (D. Ariz.) (securities fraud) (class recovered $12.25 million).

- *In re Del Val Financial Corp. Securities Litigation*, 92 Civ 4854 (S.D.N.Y.) (class recovered $11.5 million).

- *In re Home Shopping Network Shareholders Litigation*, Consolidated Civil Action No. 12868, (Del. Ch. 1995) (class recovered $13 million).

- *In re Bristol-Meyers Squibb Co. Securities Litigation*, 92 Civ 4007 (S.D.N.Y.) (class recovered $19 million).

- *In re Spectrum Information Technologies Securities Litigation*, CV 93-2245 (E.D.N.Y.) (class recovered $13 million).

- *In re Chase Manhattan Securities Litigation*, 90 Civ. 6092 (LJF) (S.D.N.Y.) (class recovered $17.5 million).

- *Prostic v. Xerox Corp.*, No. B-90-113 (EBB) (D. Conn.) (class recovered $9 million).

- *Steiner v. Hercules*, Civil Action No. 90-442-RRM (D. Del.) (class recovered $18 million).

- *In re Ambase Securities Litigation*, 90 Civ 2011 (S.D.N.Y.) (class recovered $14.6 million).

- *Steiner v. Phillips (In re Southmark Securities Litigation)*, CA No. 3-89-1402-D (N.D. Tex.) (class recovered $70 million).

WOLF
HALDENSTEIN
ADLER FREEMAN
& HERZ LLP





- *Steiner v. Ideal Basic Industries, Inc.*, No. 86-M 456 (D. Colo. 1989) (securities fraud) (class recovered $18 million).

- *Tucson Electric Power Derivative Litigation*, 2:89 Civ. 01274 TUC. ACM (corporation recovered $30 million).

- *Alleco Stockholders Litigation*, (Md.Cir.Ct. Pr. Georges County) (class recovered $16 million).

- *In re Revlon Group, Inc. Shareholders Litigation*, No. 8362 (Del. Ch.) (class recovered $30 million).

- *In re Taft Broadcasting Company Shareholders Litigation*, No. 8897 (Del. Ch.) (class recovered $20 million).

- *In re Southland Corp. Securities Litigation*, No. 87-8834-K (N.D.Tex.) (class recovered $20 million).

- *In re Crocker Bank Securities Litigation*, CA No. 7405 (Del. Ch.) (class recovered $30 million).

- *In re Warner Communications Securities Litigation*, No. 82 Civ. 8288 (JFK) (S.D.N.Y.) (class recovered $17.5 million).

- *Joseph v. Shell Oil*, CA No. 7450 (Del. Ch.) (securities fraud) (class recovered $200 million).

- *In re Flight Transportation Corp. Securities Litigation*, Master Docket No. 4-82-874, MDL No. 517 (D. Minn.) (class recovered $50 million.).

- *In re Whittaker Corporation Securities Litigation*, CA000817 (Cal. Super. Ct., Los Angeles County) (class recovered $18 million).

- *Naevus International, Inc. v. AT&T Corp.*, C.A. No. 602191/99 (N.Y. Sup. Ct.) (consumer fraud) (class recovered $40 million).

- *Sewell v. Sprint PCS Limited Partnership*, C.A. No. 97-188027/CC 3879 (Cir. Ct. for Baltimore City) (consumer fraud) (class recovered $45.2 million).

REPRESENTATIVE REPORTED OPINIONS SINCE 1990 IN WHICH WOLF HALDENSTEIN WAS LEAD COUNSEL OR HAD ANOTHER SIGNIFICANT ROLE

34

WOLF
HALDENSTEIN
ADLER FREEMAN
& HERZ LLP

FEDERAL APPEALS COURT OPINIONS





- *Harzewski v. Guidant Corp.*, 489 F.3d 799 (7th Cir. 2007).

- *In re Pharmatrak, Inc. Privacy Litig.*, 2003 U.S. App. LEXIS 8758 (1st Cir. May 9, 2003).

- *Berger v. Compaq Computer Corp.*, 257 F.3d 475 (2001), clarified, 279 F.3d 313 (5th Cir. 2002).

- *In re Bankamerica Corp. Securities Litigation*, 263 F.3d 795 (8th Cir. 2001).

- *Wright v. Ernst & Young LLP*, 152 F.3d 169 (2d Cir. 1998).

- *Romine v. Compuserve Corp.*, 160 F.3d 337 (6th Cir. 1998).

- *Felzen v. Andreas,* 134 F.3d 873 (7th Cir. 1998).

- *Brown v. Radica Games (In re Radica Games Securities Litigation),* No. 96-17274, 1997 U.S. App. LEXIS 32775 (9th Cir. Nov. 14, 1997).

- *Robbins v. Koger Properties,* 116 F.3d 1441 (11th Cir. 1997).

- *In re Painewebber Inc. Limited Partnerships Litigation,* 94 F.3d 49 (2d Cir. 1996).

- *Glassman v. Computervision Corp.,* 90 F.3d 617 (1st Cir. 1996).

- *Alpern v. Utilicorp United, Inc.,* 84 F.3d 1525 (8th Cir. 1996).

- *Shaw v. Digital Equipment Corp.,* 82 F.3d 1194 (1st Cir. 1996).

- *Riley v. Simmons*, 45 F.3d 764 (3d Cir. 1995).

- *Stepak v. Addison,* 20 F.3d 398 (11th Cir. 1994).

- *County of Suffolk v. Long Island Lighting Co.,* 907 F.2d 1295 (2d Cir. 1990).

FEDERAL DISTRICT COURT OPINIONS

WOLF
HALDENSTEIN
ADLER FREEMAN
& HERZ LLP

- *Schoenbaum v. E.I. Dupont De Nemours and Co.*, 2007 WL 2768383 (E.D. Mo. Sept. 20, 2007).

- *Jeffries v. Pension Trust Fund*, 99 Civ. 4174 (LMM), 2007 U.S. Dist. LEXIS 61454 (S.D.N.Y. Aug. 20, 2007).

- *Klein v. Ryan Beck*, 06-Civ. 3460 (WCC), 2007 U.S. Dist. LEXIS 51465 (S.D.N.Y. July 13, 2007).

- *Cannon v. MBNA Corp.* No. 05-429 GMS, 2007 U.S. Dist. LEXIS 48901 (D. Del. 2007).

- *In re Aquila ERISA Litig.*, 237 F.R.D. 202 (W.D. Mo. 2006).

- *Smith v. Aon Corp.*, 238 F.R.D. 609 (N.D. Ill. 2006).

- *In re Sepracor Inc. Securities Litigation*, 233 F.R.D. 52 (D. Mass. 2005).

- *In re Transkaryotic Therapies, Inc. Securities Litigation*, No. 03-10165, 2005 U.S. Dist. LEXIS 29656 (D. Mass. Nov. 28, 2005).

- *In re Luxottica Group, S.p.A. Securities Litigation*, 2005 U.S. Dist. LEXIS 9071 (E.D.N.Y. May 12, 2005).

- *In re CNL Hotels & Resorts, Inc. Securities Litigation*, 2005 U.S. Dist. LEXIS 38876, No. 6:04-cv-1231-Orl-31KRS (M.D. Fla. May 9, 2005).

- *Johnson v. Aegon USA, Inc.*, 1:01-CV-2617 (N.D. Ga. Sept. 20, 2004).

- *Freeland v. Iridium World Communications, Ltd.*, 99-1002 (D.D.C. Aug. 31, 2004).

- *In re Acclaim Entertainment, Inc. Securities Litigation*, 03-CV-1270 (E.D.N.Y. June 22, 2004).

- *In re Sepracor Inc. Securities Litigation*, 308 F. Supp. 2d 20 (D. Mass. 2004).

- *In re Concord EFS, Inc. Securities Litigation*, No. 02-2697 (W.D. Tenn. Jan. 7, 2004).

- *In re Enterprise Mortgage Acceptance Co., LLC, Sec. Litig.*, 02-Civ. 10288 (SWK) (S.D.N.Y. Nov. 5, 2003).

WOLF
HALDENSTEIN
ADLER FREEMAN
& HERZ LLP

["





- *Kurzweil v. Philip Morris Cos.*, 94 Civ. 2373 (MBM), 2001 U.S. Dist. LEXIS 83 (S.D.N.Y. Jan. 9, 2001).

- *Goldberger v. Bear, Stearns & Co.*, 98 Civ. 8677 (JSM), 2000 U.S. Dist. LEXIS 18714 (S.D.N.Y. Dec. 28, 2000).

- *In re Newell Rubbermaid, Inc., Securities Litigation,* Case No. 99 C 6853, 2000 U.S. Dist. LEXIS 15190 (N.D. Ill. Oct. 2, 2000).

- *Stanley v. Safeskin Corp.*, Case No. 99 CV 454 BTM (LSP), 2000 U.S. Dist. LEXIS 14100, Fed. Sec. L. Rep. (CCH) P91, 221 (S.D. Cal. Sept. 18, 2000).

- *In re MicroStrategy, Inc. Securities Litigation*, 115 F. Supp. 2d 620 (E.D. Va. 2000).

- *In re USA Talks.com, Inc. Securities Litigation,* 2000 U.S. Dist. LEXIS 14823, Fed. Sec. L. Rep. (CCH) P91, 231 (S.D. Cal. Sept. 14, 2000).

- *In re Sotheby's Holdings, Inc. Securities Litigation,* 00 CIV. 1041 (DLC), 2000 U.S. Dist. LEXIS 12504, Fed. Sec. L. Rep. (CCH) P91, 059 (S.D.N.Y. Aug. 31, 2000).

- *Dumont v. Charles Schwab & Co., Inc.*, Civil Action No. 99-2840 2000 U.S. Dist. LEXIS 10906 (E.D. La. July 21, 2000).

- *Berger v. Compaq Computer Corp.*, Civil Action No. H-98-1148, 2000 U.S. Dist. LEXIS 21424 (S.D. Tex. July 17, 2000).

- *In re BankAmerica Corp. Securities Litigation,* 95 F. Supp. 2d 1044 (E.D. Mo. 2000).

- *In re Carnegie International Corp. Securities Litigation,* 107 F. Supp. 2d 676 (D. Md. 2000).

- *Berger v. Compaq Computer Corp.*, Civil Action No. H-98-1148, 2000 U.S. Dist. LEXIS 21423 (S.D. Tex. Mar. 13, 2000).

- *In re Imperial Credit Industries Securities Litigation,* CV 98-8842 SVW, 2000 U.S. Dist. LEXIS 2340 (C.D.Cal. Feb. 23, 2000).

- *Sturm v. Marriott Marquis Corp.*, 85 F. Supp. 2d 1356 (N.D. Ga. 2000).

WOLF
HALDENSTEIN
ADLER FREEMAN
& HERZ LLP





- *In re Health Management Systems Securities Litigation*, 82 F. Supp. 2d 227 (S.D.N.Y. 2000).

- *Dumont v. Charles Schwab & Co., Inc.*, Civil Action No. 99-2840, 2000 U.S. Dist. LEXIS 619 (E.D. La. Jan. 19, 2000).

- *In re MicroStrategy, Inc. Securities Litigation*, 110 F. Supp. 2d 427 (E.D. Va. 2000).

- *In re BankAmerica Corp. Securities Litigation*, 78 F. Supp. 2d 976 (E.D. Mo. 1999).

- *Kurzweil v. Philip Morris Cos.*, 94 Civ. 2373 (MBM), 1999 U.S. Dist. LEXIS 18378 (S.D.N.Y. Nov. 24, 1999).

- *In re Nanophase Technologies Corp. Litigation*, 98 C 3450, 1999 U.S. Dist. LEXIS 16171 (N.D. Ill. Sept. 27, 1999).

- *In re Clearly Canadian Securities Litigation*, File No. C-93-1037-VRW, 1999 U.S. Dist. LEXIS 14273 Cal. Sept. 7, 1999).

- *Yuan v. Bayard Drilling Technologies, Inc.*, 96 F. Supp. 2d 1259 (W.D. Okla. 1999).

- *In re Spyglass, Inc. Securities Litigation*, No. 99 C 512, 1999 U.S. Dist. LEXIS 11382 (N.D. Ill. July 20, 1999).

- *Carley Capital Group v. Deloitte & Touche, L.L.P.*, 1:97-CV-3183-TWT, 1999 U.S. Dist. LEXIS 11595 (N.D.Ga. June 30, 1999).

- *Carley Capital Group v. Deloitte & Touche, L.L.P.*, 1:97-CV-3183-TWT, 1999 U.S. Dist. LEXIS 11596 (N.D. Ga. June 30, 1999).

- *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, 98 CV 3287, 1999 U.S. Dist. LEXIS 11363 (E.D.N.Y. June 1, 1999).

- *Carley Capital Group v. Deloitte & Touche, L.L.P.*, 1:97-CV-3183-TWT, 1999 U.S. Dist. LEXIS 1368, Fed. Sec. L. Rep. (CCH) P90, 429 (N.D. Ga. Jan. 19, 1999).

- *Longman v. Food Lion, Inc.*, 186 F.R.D. 331 (M.D.N.C. 1999).

WOLF
HALDENSTEIN
ADLER FREEMAN
& HERZ LLP





- *Walsingham v. Biocontrol Technology, Inc.,* 66 F. Supp. 2d 669 (W.D. Pa. 1998).

- *Sturm v. Marriott Marquis Corp.,* 26 F. Supp. 2d 1358 (N.D. Ga. 1998).

- *Carley Capital Group v. Deloitte & Touche, L.L.P.,* 27 F. Supp. 2d 1324 (N.D. Ga. 1998).

- *In re MobileMedia Securities Litigation,* 28 F.Supp.2d 901 (D.N.J. 1998).

- *Weikel v. Tower Semiconductor, Ltd.,* 183 F.R.D. 377 (D.N.J. 1998).

- *In re Health Management Systems Securities Litigation,* 97 Civ. 1865 (HB), 1998 U.S. Dist. LEXIS 8061 (S.D.N.Y. May 27, 1998).

- *In re Painewebber Ltd. Partnership Litigation,* 999 F. Supp. 719 (S.D.N.Y. 1998).

- *Carley Capital Group v. Deloitte & Touche, L.L.P.,* 1:97-cv-3183-TWT, 1998 U.S. Dist. LEXIS 23222 (N.D. Ga. Feb. 10, 1998).

- *In re TCW/DW North American Government Income Trust Securities Litigation,* 95 Civ. 0167 (PKL), 1997 U.S. Dist. LEXIS 18485 (S.D.N.Y. Nov. 20, 1997).

- *Wright v. Ernst & Young, LLP,* 97 Civ. 2189 (SAS), 1997 U.S. Dist. LEXIS 13630 (S.D.N.Y. Sept. 9, 1997).

- *Felzen v. Andreas,* No. 95-2279, 1997 U.S. Dist. LEXIS 23646 (C.D. Ill. July 7, 1997).

- *Felzen v. Andreas,* No. 95-2279, 1997 U.S. Dist. LEXIS 23647 (C.D. Ill. July 7, 1997).

- *A. Ronald Sirna, Jr., P.C. Profit Sharing Plan v. Prudential Securities, Inc.,* 964 F. Supp. 147 (S.D.N.Y. 1997).

- *Kurzweil v. Philip Morris Companies,* 94 Civ. 2373 (MBM), 1997 U.S. Dist. LEXIS 4451 (S.D.N.Y. April 8, 1997).

- *Bobrow v. Mobilmedia, Inc.,* Civil Action No. 96-4715, 1997 U.S. Dist. LEXIS 23806 (D.N.J. March 31, 1997).

WOLF
HALDENSTEIN
ADLER FREEMAN
& HERZ LLP

- *Kalodner v. Michaels Stores, Inc.*, 172 F.R.D. 200 (N.D.Tex. 1997).

- *In re Painewebber Ltd. Partnerships Litigation*, 171 F.R.D. 104 (S.D.N.Y. 1997).

- *A. Ronald Sirna, Jr., P.C. Profit Sharing Plan v. Prudential Securities, Inc.*, 95 Civ. 8422 (LAK), 1997 U.S. Dist. LEXIS 1226 (S.D.N.Y. Feb. 7, 1997).

- *Dresner Co. Profit Sharing Plan v. First Fidelity Bank, N.A.*, 95 Civ. 1924 (MBM), 1996 U.S. Dist. LEXIS 17913 (S.D.N.Y. Dec. 3, 1996).

- *Simon v. American Power Conversion Corp.*, 945 F. Supp. 416 (D.R.I. 1996).

- *TII Industries, Inc.*, 96 Civ. 4412 (SAS), 1996 U.S. Dist. LEXIS 14466 (S.D.N.Y. Oct. 1, 1996).

- *In re TCW/DW North American Government Income Trust Securities Litigation*, 941 F. Supp. 326 (S.D.N.Y. Oct. 1, 1996).

- *In re Painewebber Ltd. Partnership Litigation*, 94 Civ. 8547 (SHS), 1996 U.S. Dist. LEXIS 9195 (S.D.N.Y. June 28, 1996).

- *In re Tricord Systems, Inc., Securities Litigation*, Civil No. 3-94-746, 1996 U.S. Dist. LEXIS 20943 (D. Minn. April 5, 1996).

- *In re Painewebber Limited Partnership Litigation*, 94 Civ. 8547 (SHS), 1996 U.S. Dist. LEXIS 1265 (S.D.N.Y. Feb. 6, 1996).

- *Zitin v. Turley*, [1991 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 96,123 (D. Ariz. June 20, 1994).

- In re Southeast Hotel Properties Limited Partnership Investor Litigation, 151 F.R.D. 597 (W.D.N.C. 1993).

STATE COURT OPINIONS

- *In re Tyson Foods, Inc., Consolidated Shareholder Litigation*, 919 A. 2d 563 (Del. Ch. 2007).

- *Naevus Int'l v. AT&T Corp.*, 283 A.D.2d 171, 724 N.Y.S.2d 721 (2001).

WOLF
HALDENSTEIN
ADLER FREEMAN
& HERZ LLP





- *Paramount Communications, Inc. v. QVC Network, Inc.*, 637 A.2d 34 (Del. Super. Ct. 1994).

- *In re Western National Corp. Shareholders Litigation*, Consolidated C.A. No. 15927, 2000 Del. Ch. LEXIS 82 (May 22, 2000).

- *In re Cencom Cable Income Partners, L.P. Litigation*, C.A. No. 14634, 2000 Del. Ch. LEXIS 90 (May 5, 2000).

- *In re Cencom Cable Income Partners, L.P. Litigation*, Consolidated C.A. No. 14634, 2000 Del. Ch. LEXIS 10 (Jan. 27, 2000).

- *In re Marriott Hotels Properties II Limited Partnership Unitholders Litigation*, Consolidated C.A. No. 14961, 2000 Del. Ch. LEXIS 17 (Jan. 24, 2000).

- *Romig v. Jefferson-Pilot Life Insurance Company*, 132 N.C. App. 682, 513 S.E.2d 598 (Ct. App. 1999), aff'd, 351 N.C. 349, 524 S.E.2d 804 (N.C.S. Ct. 2000).

- *Wallace v. Wood*, 752 A.2d 1175 (Del. Ch. 1999).

- *Greenwald v. Batterson*, C.A. No. 16475, 1999 Del. Ch. LEXIS 158 (July 26, 1999).

- *Brown v. Perrette*, Civil Action No. 13531, 1999 Del. Ch. LEXIS 92 (May 18, 1999).

- *In re Cencom Cable Income Partners, L.P. Litigation*, C.A. No. 14634, 1997 Del. Ch. LEXIS 146 (Oct. 15, 1997).

- *In re Marriott Hotel Properties II Limited Partnership Unitholders Litigation*, Consolidated C.A. No. 14961, 1997 Del. Ch. LEXIS 128 (Sept. 17, 1997).

- *In re Cheyenne Software Shareholders Litigation*, Consolidated C.A. No. 14941, 1996 Del. Ch. LEXIS 142 (Nov. 7, 1996).

- *Seinfeld v. Robinson*, 246 A.D.2d 291, 676 N.Y.S.2d 579 (N.Y. 1998).

- *Werner v. Alexander*, 130 N.C. App. 435, 502 S.E.2d 897 (N.C. Ct. App. 1998).

WOLF
HALDENSTEIN
ADLER FREEMAN
& HERZ LLP

## Non-Discrimination Policies

Wolf Haldenstein does not discriminate or tolerate harassment against any employee or applicant because of race, creed, color, national origin, sex, age, disability, marital status, sexual orientation, or alienage or citizenship status and designs its hiring practices to ensure that minority group members and women are afforded equal employment opportunities without discrimination. The Firm is in compliance with all applicable Federal, State, County, and City equal employment opportunity laws.

Wolf Haldenstein is proud of its long history of support for the rights of, and employment opportunities for, women, the disadvantaged, and minority group persons, including the participation in civil rights and voter registration activities in the South in the early 1960's by partners of the Firm; the part-time employment of disadvantaged youth through various public school programs; the varied *pro bono* activities performed by many of the Firm's lawyers; the employment of many women and minority group persons in various capacities at the Firm, including at the partner level; the hiring of ex-offenders in supported job training programs; and the use of minority and women-owned businesses to provide services and supplies to the Firm.



WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP
270 MADISON AVENUE
NEW YORK, NY 10016
TELEPHONE: 212-545-4600
TELECOPIER: 212-545-4653

WWW.WHAFH.COM

SYMPHONY TOWERS
750 B STREET, SUITE 2770
SAN DIEGO, CA 92101
TELEPHONE: 619-239-4599
TELECOPIER: 619-234-4599

55 WEST MONROE STREET
SUITE 1111
CHICAGO, IL 60603
TELEPHONE: 312-984-0000
TELECOPIER: 312-984-0001

625 NORTH FLAGLER DRIVE
WEST PALM BEACH, FL 33401
TELEPHONE: 561-833-1776





43

WOLF
HALDENSTEIN
ADLER FREEMAN
& HERZ LLP

# EXHIBIT 2

070815DRAMPJHF.txt

Pages 1 - 56

United States District Court

Northern District of California

Before The Honorable Phyllis J. Hamilton

| | | |
|---|---|---|
| In re: Dynamic Random | ) | |
| Access Memory Antitrust | ) | |
| Litigation | ) | |
| | ) | |
| | ) | No. MDL 02-1486 PJH |
| _____ | ) | |

San Francisco, California
Wednesday, August 15, 2007

Reporter's Transcript Of Proceedings

Appearances:

For Plaintiff:           Saveri & Saveri, Inc.
                       111 Pine Street, Suite 1700
                       San Francisco, California  94111
           By:  Guido Saveri, Esquire
                       Richard Alexander Saveri, Esquire

                       Hagens Berman Sobol Shapiro
                       1301 Fifth Avenue, Suite 2900
                       Seattle, Washington  98101
           By:  Anthony D. Shapiro, Esquire

                       Cooper & Kirkham, P.C.
                       655 Montgomery Street, 17th Floor
                       San Francisco, California  94111
           By:  Joseph D. Cooper, Esquire

(Appearances continued on next page.)

Reported By:         Sahar McVickar, RPR, CSR No. 12963
                       Official Reporter, U.S. District Court
                       For the Northern District of California

              (Computerized Transcription By Eclipse)

Appearances, continued:

For Plaintiff:           Steyer Lowenthal Boodrookas
                       Alvarez & Smith LLP
                       One California Street, Third Floor
                       San Francisco, California

Page 1

```
                070815DRAMPJHF.txt
    By:  Allan Steyer, Esquire

         Damrell Nelson Schrimp
         Pallios Pacher & Silva
         1601 I Street, Fifth Floor
         Modesto, California  95354
    By:  Roger M. Schrimp, Esquire

         Wolf Haldenstein Adler Freeman Herz
         55 West Monroe Street, Suite 1111
         Chicago, Illinois  60603
    By:  Mary Jane Edelstein Fait, Esquire
         Daniel W. Krasner, Esquire

         Zelle Hofmann Voelbel Mason & Gette
         44 Montgomery Street, Suite 3400
         San Francisco, California  94104

    By:  Craig C. Corbitt, Esquire
         The Mogin Law Firm, P.C.
         110 Juniper Street
         San Diego, California  92101
    By:  Daniel J. Mogin, Esquire

         Cohen Milstein Hausfeld & Toll
         One Embarcadero Center, Suite 500
         San Francisco, California  94111
    By:  Michael P. Lehmann, Esquire

         Furth Lehmann LLP
         225 Bush Street, 15th Floor
         San Francisco, California  94104
    By:  Henry A. Cirillo, Esquire

         Gustafson Luek PLLC
         650 Nortstar East
         608 Second Avenue South
         Minneapolis Minnesota  55402
    By:  Daniel E. Gustafson, Esquire


(Appearances continued on next page.)


Appearances, continued:

For Plaintiff:      Office of the Attorney General
                    455 Golden Gate Avenue, Suite 11000
                    San Francisco, California  94102
    By:  Kathleen E. Foote, Esquire

For Defendant:      O'Melveny & Myers LLP
                    400 South Hope Street
                    Los Angeles, California  90071
    By:  Kenneth R. O'Rourke, Esquire
         Tim M. Martin, Esquire

                    The Orrick Building
                    1000 Marsh Road
                    Menlo Park, California  94025
                         Page 2
```

070815DRAMPJHF.txt

By: Na'il Benjamin, Esquire

Thelen Reid Brown Raysman & Steiner
101 Second Street, Suite 1800
San Francisco, California  94105
By: Jonathan E. Swartz, Esquire
Paul R. Griffin, Esquire

Heller Ehrman
333 Bush Street
San Francisco, California
By: David C. Brownstein, Esquire

Sheppard Mullin
Four Embarcadero Center, 17th Floor
San Francisco, California  94111
By: Michael W. Scarborough, Esquire

Gibson, Dunn & Crutcher LLP
One Montgomery Street
San Francisco, California  94104
By: Joel S. Sanders, Esquire

Kaye Scholer LLP
1999 Avenue of the Stars, Suite 1700
Los Angeles, California  90067
By: Julian Brew, Esquire


---oOo---

4

1  Wednesday, August 15, 2007                9:00 a.m.

2                  P R O C E E D I N G S

3          THE CLERK:  Calling MDL case number 02-1486, Dynamic

4  Random Access Memory.

5          Appearances.

6          MR. SAVERI:  Good morning, Your Honor.

7          Guido Saveri for the direct plaintiffs.

8          THE COURT:  Good morning.

9          MR. SAVERI:  What we have this morning is

10 plaintiff's motion for attorney fees, and that motion is going

11 to be presented by Mr. Shapiro, co-lead counsel.

12         I would like to report to the Court one thing.

13 Since we were out here last time, you will recall that you

Page 3

070815DRAMPJHF.txt

8          MR. SHAPIRO:  Correct.

9          THE COURT:  Okay.

10          All right, then the -- then is there anything you

11    wish to add before I make my final determination with regard to

12    the fee request?

13          MR. SHAPIRO:  Not unless Your Honor has further

14    questions.

15          THE COURT:  No, you've answered my questions.

16          All right, I think I can conclude on the basis with

17    my five years with you all, watching this litigation progress

18    and seeing it wind to a conclusion, that the results are

19    exceptional.  The percentages, as you've outlined them, do put

20    this in one of the upper categories of results in this kind of

21    a class action.

22          I'm aware of the complexity, both in terms of the

23    substantive law that was at issue -- we had a lot of motions in

24    this case, and I must say no unnecessary motions.  I thought

25    that you all did an exceptionally good job of bringing to me

                                                                    10


1    only those matters that really required the Court's attention.

2          You did an exceptionally good job at organizing and

3    managing the case in assisting me in management of the case.

4    There was excellent coordination between all of the various

5    different plaintiffs' counsel, with your group and the other

6    groups that are part of this litigation.  You have coordinated

7    very well with defense counsel.  Everyone has been extremely

8    cooperative, given just the massive nature of this case.  So my

9    conclusion is the case was well litigated by both sides, well

10    managed as well by both sides.

11          The defense I also will take the opportunity to

12    compliment as well in their coordination.  You all didn't have

070815DRAMPJHF.txt

21            All right, are there any other questions?  Anything

22    I've overlooked?

23            MR. SHAPIRO:  No, Your Honor.

24            THE COURT:  Okay, then I just have a concluding

25    remark.

                                                              19


1            Little did I know five years ago when I consented to

2    having this multi-district litigation assigned to me what an

3    incredible drain on my time and resources that this case would

4    entail.  And we have now just concluded the first portion of

5    the case.  There is now still plenty of it left, and I'm sure

6    it will be on my docket until I retire.

7                         (Laughter.)

8            THE COURT:  Nonetheless, it's been very satisfying

9    to watch the litigation, to be involved in it.  You all -- and

10   I'm speaking to defense counsel as well, you all have done an

11   exceptionally good job in coordinating management and

12   litigating the case.  As I've said, I think that you have been

13   very respectful of my time.  You have been very careful to not

14   bring me a lot of unnecessary matters to deal with.

15           I know that that wouldn't occur, because I've got

16   cases that are a fraction of the size of this case that I spend

17   a lot more time on just because counsel aren't acting as

18   cooperatively and as professionally as you all have.

19           So I just wanted to take the opportunity to tell you

20   that even though in a typical class approval, final approval

21   motion I hear this, I read week after week this language about

22   how well, how hard fought the litigation was, and able your

23   adversary was and the kind of exceptional results that you

24   achieved, but this time I have to say that I think the language

25   that appears in your motion is deserved.  It's not just mere

                         Page 16                              20

070815DRAMPJHF.txt

1  puffery.  I think both have done an incredible job.  And I just

2  wanted to thank you all for your courtesy to the Court and to

3  each other, which has been obvious.

4            MR. SHAPIRO:  We would like to thank you, Your

5  Honor.

6            THE COURT:  All right, then, that concludes this

7  portion of the case.  Thank you.

8            THE CLERK:  Calling civil case number 02-1486,

9  Dynamic Random Access Memory Antitrust Litigation, indirect

10  purchaser's portion.

11            Appearances.

12            MR. O'ROURKE:  Good morning, Your Honor.

13            I'm Ken O'Rourke with the Hynix Semiconductor

14  defendants.

15            With me this morning, my colleague, Timothy Martin.

16            THE COURT:  Good morning.

17            MR. COOPER:  Good morning, Your Honor.

18            Joseph Cooper, one of plaintiff's co-lead counsel.

19            Mr. Corbitt will be presenting the indirect

20  purchaser plaintiffs' position.

21            THE COURT:  What was the name?

22            MR. COOPER:  Craig Corbitt from Zelle Hofmann.

23            THE COURT:  All right, good morning.

24            All right, this is DRAM, part 2, all right, the

25  indirect purchasers.  I have on calendar this morning the

                                                          21


1  plaintiff's motion to file the second amended complaint.  I

2  understand that you all have filed an amended complaint

3  following my grant of the defendant's motion for judgment on

4  the pleadings, but I indicated that the defendant should wait

                              Page 17

## CERTIFICATE OF REPORTER

I, Sahar McVickar, Official Court Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.  The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

Sahar McVickar, RPR, CSR No. 12963

August 17, 2007

# EXHIBIT 3

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP
Mark C. Rifkin (MR-0904)
Alexander H. Schmidt (AS-8304)
Martin E. Restituyo (MR-0856)
270 Madison Avenue
New York, New York 10016
(212) 545-4600
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————

HERBERT H. KLIEGERMAN, on behalf of
himself and others similarly situated,

                        Plaintiff,

        - against -

APPLE, INC. and AT&T MOBILITY, LLC,

                    Defendants.

———————————————————————

07-cv-08404-PKC

**AMENDED
CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

       Plaintiff Herbert H. Kliegerman, by his undersigned attorneys, for this amended class action complaint, alleges upon personal knowledge as to himself and his own actions, and upon information and belief, including the investigation of counsel, as follows:

### NATURE OF ACTION

       1.     This is an antitrust class action pursuant to section 2 of the Sherman Act, a consumer class action brought pursuant to the laws of 43 states and the District of Columbia,[1] and a breach of warranty class action pursuant to the federal Magnuson-Moss Warranty Act, brought by Plaintiff on his own behalf and on behalf of classes of persons similarly situated, those being persons who purchased an Apple iPhone from either Defendant between June 29, 2007 (or the actual date that the iPhone became available) through the date of trial of this action.

———————————————————————

[1] The state consumer protection statutes being sued upon are identified at ¶ 129 n.5 below.

A.    **Summary of Material Facts**

2.      Defendant Apple, Inc. ("Apple") launched its iPhone on or about June 29, 2007. Prior to launch, Apple entered into an exclusive five-year contract with Defendant AT&T Mobility, LLC ("AT&T") that establishes AT&T as the exclusive provider of cell phone voice and data services for iPhone customers through 2012. As part of the contract, Apple shares in AT&T's revenues and profits.

3.      To enforce AT&T's exclusivity, Apple, among other things, programmed and installed software locks on each iPhone it sold that prevented the purchaser from switching to another carrier that competes with AT&T to provide cell phone voice and data services. Under an exemption to the Digital Millennium Copyright Act of 1998, cell phone consumers have an absolute legal right to modify their phones to use the network of their carrier of choice. Defendants have unlawfully prevented iPhone customers from exercising that legal right by locking the iPhones and refusing to give customers the software codes needed to unlock them. Among other injurious effects, iPhone consumers have been unable to switch to local carriers while traveling abroad and have consequently been forced to pay exorbitant roaming charges – amounting to thousands of dollars per trip – to Defendants. Through their refusal to unlock the iPhones, Defendants have unlawfully stifled competition, reduced output and consumer choice, and artificially increased prices in the aftermarket for iPhone voice and data services.

4.      Under its agreement with AT&T, Apple retained exclusive control over the design, features and operating software for the iPhone. To enhance its iPhone related revenues, Apple has created a number of software programs called "applications," such as ring tone, instant messaging and photography enabling software, that can be downloaded and used by iPhone owners. Apple has also entered into agreements with other software manufacturers by which

2

Apple "approves" their software applications for iPhone use in exchange for a share of the manufacturer's resulting revenues. Apple refuses to "approve" any application in which Apple has no financial interest. Apple also unlawfully discourages iPhone customers from downloading competing application software by telling customers that Apple will void and refuse to honor the iPhone warranty of any customer who has downloaded competing applications. Through these actions, Apple has unlawfully stifled competition, reduced output and consumer choice, and artificially increased prices in the aftermarket for iPhone software applications.[2]

5.    In an act that can only be described as reprehensible and unconscionable as well as illegal, Apple retaliated against and punished consumers who had exercised their legal right to unlock their iPhone or who had installed software applications that competed with Apple's. On September 27, 2007, under the guise of issuing an "upgraded" version of the iPhone operating software, Apple issued a software update in which Apple had secretly embedded malicious codes designed to "brick" (that, is, render completely inoperable) or otherwise damage the iPhones of any consumer that had unlocked the iPhone or downloaded competing applications.

6.    When iPhone owners took their damaged phones to Apple or AT&T for repair or replacement, they were unlawfully told that they had breached their warranty agreements by unlocking their phone or downloading unapproved software and that their only remedy was to buy a new iPhone. Because Apple had deliberately damaged or destroyed their iPhones, Apple and AT&T were obligated by law to honor their warranties and repair or replace the phones.

---

[2] Apple has recently announced that it intends to permit use of iPhone applications created by independent software developers in February 2008.

3

B.     **Summary of Claims**

7.     In pursuit and furtherance of their unlawful anticompetitive activities, Apple and AT&T engaged in numerous breaches of warranty under the Magnuson-Moss Warranty Act ("MMWA") and unlawful deceptive acts or practices within the meaning, of the consumer protection laws at issue because they (a) failed to disclose to consumers that the iPhone's operating software contained codes that "locked" the iPhones to only accept AT&T Subscriber Identity Modules ("SIM cards"), thereby preventing iPhone purchasers from using any cell phone voice and data service provider other than AT&T (with which Apple shares revenues); (b) failed to disclose to consumers that the "unlock code" that would enable consumers to use a service other than AT&T would not be provided to iPhone owners, even though AT&T routinely provides such unlock codes for other types of cell phones; (c) failed to disclose to consumers that Apple would seek to prohibit iPhone owners from downloading programs or applications other than those "approved" by, and which generated revenue for, Apple (collectively, "Third Party Apps") and (d) failed to disclose to consumers that iPhone owners would incur excessive and unconscionable roaming fees – often several thousands of dollars – simply for carrying the iPhone with them while traveling internationally, even if they did not actively use the iPhone's data features during their trip.

8.     Apple also engaged in breaches of warranty under the MMWA and deceptive acts or practices, and committed trespass, when, on or about September 27, 2007, it released an update of its iPhone operating software ("Version 1.1.1") without disclosing to consumers that Apple had embedded malicious codes within the upgrade that would cause to malfunction or "brick" (a) any iPhone that had been "unlocked" to enable use of a non-AT&T provider's voice or data services; or (b) any iPhone on which the owner had installed Third Party Apps.

4

9.    Apple and AT&T further breached their warranties and engaged in deceptive acts or practices by refusing to repair or replace iPhones that had been destroyed when their owners downloaded Apple's malicious "upgraded" operating system.

10.    Apple and AT&T violated section 2 of the Sherman Act, 15 U.S.C. § 2, by monopolizing or attempting to monopolize the aftermarket for voice and data services and software applications for iPhones in a manner that harmed competition and injured consumers by reducing output and increasing prices for those aftermarket services and applications.

11.    Apple and AT&T also violated section 2 of the Sherman Act, 15 U.S.C. § 2, by conspiring to monopolize the aftermarket for iPhone voice and data services.

12.    Plaintiff seeks declaratory and injunctive relief, treble and exemplary damages, costs and attorneys' fees. As for equitable relief, Plaintiff seeks an order: (i) requiring Defendant Apple to issue a corrected or upgraded version of its operating software that eliminates the malicious iPhone-destroying codes in its current Version 1.1.1 operating system; (ii) requiring Defendants to repair or replace, at no cost to the consumer, all iPhones rendered inoperable upon downloading Apple's Version 1.1.1 operating system; (iii) restraining Defendants from selling iPhones that are programmed in any way to prevent or hinder consumers from unlocking their SIM card or from downloading Third Party Apps; (iv) requiring Defendants to provide the iPhone SIM unlock codes to members of the class immediately upon request; (v) restraining Defendants from selling locked iPhones without adequately disclosing the fact that they are locked to work only with AT&T SIM cards; (vi) requiring Defendants adequately to disclose the fact that iPhone owners may incur excessive data roaming charges while traveling internationally; and (vii) requiring Defendant Apple to permit consumers to download Third Party Apps on their iPhones.

5

## THE PARTIES

13.     Plaintiff, Herbert H. Kliegerman (the "Plaintiff") is a 68 year-old individual residing in New York, New York, who purchased three iPhones and an AT&T voice and data service plan for the iPhones.

14.     Defendant Apple is a California corporation with a principal place of business located at 1 Infinite Loop, Cupertino, California 95014. Apple regularly conducts and transacts business in this District, as well as elsewhere throughout New York and the United States. Apple manufactures, markets and sells the iPhone, among other consumer electronic devices.

15.     Defendant AT&T is a Delaware limited liability company with a principal place of business located at 5565 Glenridge Connector, Atlanta, Georgia 30349. AT&T is a cell phone service provider that regularly conducts and transacts business in this District, as well as elsewhere throughout New York and the United States. AT&T markets and sells the iPhone and, pursuant to a written agreement with Apple, is the exclusive provider of wire and data services to iPhone customers.

## JURISDICTION AND VENUE

16.     This Court has federal question jurisdiction pursuant to the Sherman Antitrust Act, 15 U.S.C. § 2, the Clayton Act, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337, and it has supplemental jurisdiction over the state law and Magnuson-Moss Warranty Act claims pursuant to 28 U.S.C. § 1367.

17.     This Court also has jurisdiction pursuant to 28 U.S.C. §1332(d)(2) because sufficient diversity of citizenship exists between parties in this action, the aggregate amount in controversy exceeds $5,000,000, and there are 100 or more members of each of the two proposed Plaintiff Classes.

6

18.    Venue is proper in this District pursuant to 28 U.S.C. §1391 because Plaintiff purchased three iPhones in this District and a substantial part of the events or omissions giving rise to his claims occurred here, and because both Defendants are corporations subject to personal jurisdiction in this District and therefore reside here for venue purposes.

## FACTUAL ALLEGATIONS

A.    **Plaintiff's Injuries**

19.    In Spring 2007, Apple began a massive advertising campaign to market their new wireless communication device, the iPhone. The iPhone was and is advertised as a mobile phone, iPod and "breakthrough" Internet communications device with desktop-class email, an "industry first" "visual voicemail," web browsing, maps and searching capability.

20.    The iPhone debuted on June 29, 2007, and despite its hefty $499 or $599 price tag,[3] consumers waited in line to get their hands on one.

21.    Pursuant to an agreement between Defendants described more fully below, during the class period the iPhone has been sold at both Apple's and AT&T's retail and online stores.

22.    Apple and AT&T entered into a multi-year exclusive service provider agreement, which on information and belief expires in 2012, pursuant to which iPhone purchasers who want wireless voice and data services must sign a two-year service contract with AT&T.

23.    On or about July 7, 2007, Plaintiff Kliegerman purchased three 8GB iPhones at the Apple store on Prince Street in New York City for $599 each. Plaintiff also executed a two-year contract with AT&T for provision of wireless voice and data services.

---

[3] Initially the 4GB iPhone retailed for $499 and the 8GB iPhone retailed for $599. Apple and AT&T now sell only the 8GB version for $399.

7

24.    Prior to purchasing the three iPhones and executing the service contract, the Defendants did not adequately disclose to Plaintiff Kliegerman that his phones were locked to only work with AT&T SIM cards or that the unlock codes would not be provided to him.

25.    Prior to purchasing the three iPhones and executing the service contract, Defendants did not adequately disclose to Plaintiff Kliegerman that he would incur excessive and unconscionable roaming fees for using the data features of the iPhone while traveling internationally.

26.    In fact, Apple states on its website that "[y]ou can browse the Internet and send emails as often as you like without being charged extra."

27.    On July 16, 2007, Plaintiff Kliegerman took an iPhone to Mexico while on vacation and used it in Mexico to check emails and surf the Internet.

28.    Upon returning home after seven days in Mexico, Plaintiff Kliegerman received a bill from AT&T, and to his astonishment AT&T charged him $2,000 in international data roaming fees for using his iPhone while in Mexico.[4]

29.    Because Plaintiff Kliegerman is a frequent international traveler, Plaintiff has desired to purchase a SIM card from a foreign wireless carrier which would allow him to utilize its voice and data networks for approximately $25 plus local service fees that are substantially less than the $2,000 international data roaming fees charged by AT&T.

30.    Unbeknownst to Plaintiff Kliegerman, his iPhones were locked so that they cannot be used with a non-AT&T SIM card while traveling abroad.

---

[4] After Plaintiff contacted AT&T, a representative from AT&T credited the Plaintiff's account $1,500 despite the fact that the Plaintiff requested the entire $2,000 be credited.

8

31.    Plaintiff Kliegerman contacted both Apple and AT&T to obtain the unlock codes for his iPhones and was informed that the unlock codes would not be provided to him.

32.    On information and belief, AT&T provides unlock codes for non-iPhone phones if requested by a consumer.

33.    Plaintiff Kliegerman will continue to incur excessive voice and data roaming charges while traveling internationally unless the Defendant provides the Plaintiff with the codes to unlock his iPhones to accept non-AT&T SIM cards.

34.    Plaintiff Kliegerman downloaded Apple's Version 1.1.1 operating system on two of his iPhones, since he has paid for and is entitled to utilize Apple's software updates. Plaintiff has declined to download Third Party Apps or to unlock his SIM card because he is fearful that Apple's imbedded malicious codes in the update will damage or permanently disable his iPhones if he does so.

## B.    The Cell Phone Industry

35.    Cellular telephone service began to be offered to consumers in 1983. Cellular telephones operate using radio frequency channels allocated by the Federal Communications Commission ("FCC"). Geographical service areas, sometimes known as "cells," are serviced by base stations using low-power radio telephone equipment, sometimes known as "cell towers." The cell towers connect to a Mobile Telephone Switching Office ("MTSO"), which controls the switching between cell phones and land line phones, accessed through the public-switched telephone network, and to other cell telephones.

36.    In cellular service there are two main competing network technologies: Global System for Mobile Communications ("GSM") and Code Division Multiple Access ("CDMA"), each of which has advantages and disadvantages that might appeal to or be rejected by individual

9

consumers. GSM is the product of an international organization founded in 1987 dedicated to providing, developing, and overseeing the worldwide wireless standard of GSM. CDMA has been a dominant network standard for North America and parts of Asia.

37.    To respond to the need for cellular phones that can also send and receive emails, streaming video and provide other services requiring higher data transfer speeds, technologies have been adopted by both CDMA and GSM carriers to comply with what the industry refers to as "3rd generation" technologies, or "3G" standards. Those technologies require the cell phone to be operating on a separate 3G network. The AT&T services provided to iPhone users described below is on AT&T's 2G network, not its 3G network.

38.    While there are a number of cellular phone service providers in the United States, only four have substantial national networks: AT&T, T-Mobile USA, Inc. ("T-Mobile"), Sprint Corporation ("Sprint"), and Cellco Partnership d/b/a/ Verizon Wireless ("Verizon") (collectively, the "Major Carriers"). Other suppliers may in effect be "resellers" of cellular telephone service which they purchase from the Major Carriers. AT&T and T-Mobile are the two GSM Major Carriers; Sprint and Verizon are the two CDMA Major Carriers.

39.    AT&T and the other wireless carriers have long dominated and controlled the cell phone industry in the United States in a manner that, according to a recent *Wall Street Journal* article, "severely limits consumer choice, stifles innovation, crushes entrepreneurship, and has made the U.S. the laughingstock of the mobile-technology world, just as the cellphone is morphing into a powerful hand-held computer." Walter S. Mossberg, "Free My Phone," *WSJ*, at R3, col. 1 (Oct. 22, 2007).

40.    Unlike the personal computer market in general – where computer manufacturers and software developers can offer products directly to consumers without having to gain the

approval of Internet service providers, and without paying those providers a penny – the wireless carriers have used their ability to grant or deny access to their wireless networks to control both the type of cell phone hardware and software that can be manufactured, and to extract payments from manufacturers granted access to their networks and customers. *Id.*

41.    The anticompetitive nature of the wireless telephone market the carriers have created facilitated and gave rise to the commercial context in which Apple and AT&T were able to commit the wrongs and offenses alleged herein.

**C.    The Cell Phone Industry's History of Misusing Locked SIM Cards**

42.    In the United States, as a general rule only GSM phones use SIM (Subscriber Identity Module) cards. The removable SIM card allows phones to be instantly activated, interchanged, swapped out and upgraded, all without carrier intervention. The SIM itself is tied to the network, rather than the actual phone. Phones that are SIM card-enabled generally can be used with any GSM carrier.

43.    Thus, the hardware of all GSM compatible cell phones give consumers some degree of choice to switch among GSM carriers' wireless networks by enabling them to replace their SIM card, a process that the average individual consumer easily can do with no training by following a few simple instructions in a matter of minutes. SIM cards are very inexpensive, often in the $25 range. When the card is changed to the SIM card of another carrier, the cell phone is immediately usable on the other carrier's network. To switch from AT&T to T-Mobile, or the other way around, all that is required is this simple change of the SIM card.

44.    For telephone users who travel, particularly to Europe, the ability to change SIM cards to a European carrier such as Orange, Vodephone or TIM, allows the user of a GSM American phone to "convert it" to a "local" phone in the country where they have traveled.

11

Absent a conversion to local service, a consumer using an American GSM cell phone abroad must pay both for the American service and for "roaming" charges, that is, the right to call or retrieve data from outside of the customer's primary calling area. Roaming charges are typically very high, often a dollar or more a minute. As a result, U.S.-based cell phone users traveling abroad can yield very substantial savings by switching the SIM card and paying for local service rather than using the U.S.-based GSM carrier.

45.   In an effort to minimize consumers' ability to switch carriers or avoid roaming charges by simply switching SIM cards, the Major Carriers, acting in concert through trade associations and standards setting organizations such as the CDMA Development Group, the Telecommunications Industry Association, the Third Generation Partnership Project, the Alliance for Telecommunications, the Open Mobile Alliance, the CSM Association, the Universal Wireless Communications Consortium, and the Cellular Telephone Industry Association, and otherwise, agreed to implement "Programming Lock" features which effectively "locked" individual handsets so that they could not be used without the "locking" code. The carriers obtained a locking code (normally only six digits long) unique to each cell phone from the cell phone manufacturer and, at least initially, refused to disclose the code to consumers. That meant that a consumer who purchased a telephone manufactured to work with one of the Major Carriers could not switch to another carrier, even temporarily, such as while traveling abroad, without buying an entirely new phone.

46.   In particular, the GSM carriers, AT&T and T-Mobile, adopted a SIM Lock standard, which locked a GSM phone to a particular SIM card, thereby preventing consumers from simply changing their SIM cards. However, throughout the class period both T-Mobile and AT&T typically unlocked SIM cards on request for international travel or even if customers

12

wanted to cancel their accounts and switch to another carrier. In most cases, the unlock code was given on request, almost instantly, over the telephone.

47.     Accordingly, AT&T will now unlock SIM cards on telephones sold only through them, such as the Blackberry Pearl and the Samsung Blackjack. There is one exception: the iPhone. AT&T will not provide the unlock code for the iPhone for international travel or otherwise. On information and belief, that is because, as described more fully below, AT&T and Apple unlawfully agreed that the iPhone would not be unlocked under any circumstances.

**D.     Apple's Misuse of Other Locked Program Codes**

48.     The iPhone operating system also contains "security measures" which are, in effect, Program Locks designed to restrict the consumer from using programs or services on the iPhone other than those sanctioned by, and which generate revenue for, Apple. By design, Apple initially programmed the iPhone in a manner that prevented iPhone purchasers from downloading any "Third Party Apps" offered by software manufacturers who did not share their revenues with Apple.

49.     However, because of the design of the Apple operating system, which is based on the widely available Unix platform, Apple's initial efforts to eliminate Third Party Apps and to prevent iPhone customers from unlocking their SIM cards were ineffective, as clever consumers and Third Party programmers quickly circumvented Apple's locking codes and made both "unlocked" iPhones and "unlocking" software for iPhones available for sale on the Internet.

50.     As described below, in September 2007 Apple viciously retaliated against iPhone purchasers who utilized these unlocking features by issuing an iPhone operating system "upgrade" that was designed to damage or destroy any iPhone that had been or might later be unlocked or on which any Third Party App had been or might later be installed.

13

**E.**  **Defendants Know they Cannot Legally Prevent Consumers from Unlocking iPhones**

51.     Over the past few years, the Major Carriers were subject to lawsuits that sought to impose liability based on the existence of Program Locks. Carriers had claimed that Program Locks were necessary to protect their copyrighted intellectual property and claimed then, as Defendants do publicly now, that the reason for the locks was to benefit consumers and protect against fraud. Carriers had also sought to assert that under the terms of the Digital Millennium Copyright Act, 17 U.S.C. §1201, et. seq. ("DMCA"), disabling the Program Locks or unlocking a SIM card would be a violation of law.

52.     The DMCA was enacted in 1998 to prohibit third parties from circumventing technological measures (called "access controls") that copyright owners had employed to control access to their protected intellectual property. However, in November 2006, the Librarian of Congress, who by statute has authority to create exemptions to the restrictions in § 1201 of the DMCA to ensure the public is able to engage in noninfringing uses of copyrighted works, announced a three-year exemption from the prohibition against circumvention of access controls for "Computer programs in the form of firmware that enable wireless telephone handsets to connect to a wireless telephone communication network, when circumvention is accomplished for the sole purpose of lawfully connecting to a wireless telephone communication network." The exemption stemmed for a recommendation by the Register of Copyrights, which concluded that "the access controls [on cell phones] do not appear to actually be deployed in order to protect the interests of the copyright owner or the value or integrity of the copyrighted work; rather, *they are used by wireless carriers to limit the ability of subscribers to switch to other carriers, a business decision that has nothing whatsoever to do with the interests protected by copyright.*" 71 Fed. Reg. 68472, 68476 (Nov. 27, 2006).

14

53.    Because Defendants were unable to enforce their Program Locks through legal means, they embarked on a scheme to enforce them unlawfully as to the iPhone.

**F.    The Apple – AT&T Exclusivity Agreement**

54.    On January 9, 2007, a little over a month after the adverse Librarian of Congress ruling, Apple announced that it had entered into an exclusive agreement making AT&T the only authorized provider of wireless voice and data services for iPhones in the United States.

55.    While the terms of Defendants' exclusivity agreement and any related agreements (collectively, the "Agreement") have not been made public, some details have leaked out in the press. First, AT&T and Apple agreed to share AT&T's voice service and data service revenue received from iPhone customers.

56.    Second, while AT&T offers iPhone purchasers a two-year contract, Apple agreed to give AT&T iPhone exclusivity for five years, so that iPhone customers whose initial service contracts expire before June 29, 2012 would have no choice but to renew with AT&T.

57.    Third, on information and belief, Apple and AT&T agreed to enforce AT&T's exclusivity by installing SIM card Program Locks on all iPhones and agreeing never to disclose the unlock codes to iPhone consumers who wished to replace the iPhone SIM card, either for international travel or to lawfully cancel their AT&T contract to switch to another carrier.

58.    Fourth, the Agreement allows Apple to control the features, content, software programming and design of the iPhone.

59.    Fifth, since both Apple and AT&T recognized that the iPhone would create a unique product for which consumers would pay a premium price compared to other cell phones, the pricing structure of the AT&T exclusivity deal was different from a typical agreement between a carrier and a handset manufacturer. Typically, the carrier subsidizes the purchase price

15

of the handset (that is, sells the cell phone to the consumer at a substantial discount off the list price) in return for the consumer entering into a service agreement with the carrier. This arrangement, the carriers argue, benefits the consumer by lowering the cell phone's price. The carriers, however, charge an early termination fee if consumers wish to cancel their service contracts mid-term, which fee the carriers argue is justified by their subsidization of the cell phone price. Upon termination, the cell phone customer can go to any carrier.

60.     In the Agreement, AT&T did not agree to subsidize the purchase of the handset but nevertheless still charges iPhone consumers a $175 early termination fee for each telephone number linked to the service plan. The early termination fee by AT&T is not justifiable absent subsidization of the handset price.

61.     Sixth, on information and belief, AT&T and Apple agreed that they would take action, legal or otherwise, to prevent users from circumventing the Program Locks and SIM card locks. A central purpose of this agreement was to suppress lawful competition domestically by T-Mobile against AT&T in the iPhone aftermarket for voice and data services, and by Third Party Application developers against Apple in the iPhone aftermarket for other applications.

62.     Finally, on information and belief, Defendants agreed Apple would be restrained for a period of time from developing a CDMA version of the iPhone to suppress competition by Sprint and Verizon. Defendants agreed to this restraint notwithstanding that Apple could easily develop an iPhone for use on CDMA networks. In fact, Apple originally approached CDMA carrier Verizon to be the iPhone exclusive service provider before Apple approached AT&T.

63.     The blatantly anticompetitive features of the Defendants' Agreement caused one *USA Today* journalist to describe Apple's agreement with AT&T as "an easy way to handcuff rivals and steal customers."

### G.    Defendants Quickly Faced Unwanted Competition in the iPhone Aftermarket

64.    Almost immediately after the iPhone was launched, Third Party Apps for the iPhone started to appear that generated competition for Apple in the applications aftermarket and for AT&T in the cellular voice and service aftermarket. For example, Mobile Chat and FlicklM gave iPhone users access to instant messaging programs from which Apple derived no revenues.

65.    Even more significantly, Apple faced competition in the iPhone ring tone aftermarket. When a customer purchases a song for $1 from the iTunes store, Apple charges the customer an additional 99 cents to convert any portion of that song into a ring tone. A number of competing programmers promptly offered a variety of ring tone programs that worked on the iPhone, which consumers were able to download both for a fee and for free. Some of these programs allowed customers to use samples of popular songs lawfully downloaded from Apple's iTunes store as a ring tone for their iPhone. Other programs, such as I-Toner from Ambrosia Software, and iPhone RingToneMaker from Efiko software, allowed customers to "clip" portions of songs purchased by them from iTunes for use as ring tones.

66.    Since many of these programs used songs downloaded from iTunes, Apple initially sought to block the use of those songs as ring tones by updating the iTunes software to install Program Locks that would interfere with such use. However, those efforts were all quickly defeated by third party programmers, sometimes within hours of the release of the update.

67.    The availability of Third Party Apps for iPhones reduced Apple's share of the iPhone aftermarket for ring tones and other applications and greatly reduced or threatened to reduce Apple's expected supracompetitive revenues and profits in that aftermarket.

68.    Unlocking of the SIM card took a little longer and was more complicated. Initially some customers sought to evade the program lock by altering the hardware. In August 2007, a

17

high-school student announced the first "hardware unlocked" iPhone on YouTube. Shortly thereafter, software unlocks were developed and an explosion of unlock solutions, both free and for a fee, appeared on the Internet. Many of the solutions involved a small change in the software, in some cases in as little as two bytes of code.

69.    The availability of SIM card unlocking solutions enabled iPhone customers to lawfully terminate their AT&T voice and data service contracts if they were unhappy with AT&T's service and switch to T-Mobile in the United States, and it enabled iPhone customers to avoid AT&T's excessive international roaming charges by replacing the AT&T SIM card with a local GSM carrier's SIM card while traveling.

70.    The availability of SIM card unlocking solutions reduced AT&T and Apple's share of the iPhone voice and data services aftermarket and greatly reduced or threatened to reduce the supracompetitive revenues and profits they had agreed to share.

**H.    Defendants' Unlawful Retaliation in Response to the Unwanted Competition**

**1.    Apple's breaches of warranty**

71.    To protect Defendants' positions in the iPhone aftermarket for voice and data services and for ring tone and other software applications, Apple repeatedly announced that any attempt to unlock the iPhone SIM or to install Third Party Apps would void the Apple warranty. This assertion was false as a matter of federal law, and was known by Apple to be false when made. The Federal Magnuson-Moss Warranty Act prohibits conditioning the iPhone warranty on the use of Apple products only, or on the use of AT&T service only, 15 USCS § 2302(c), which is effectively what the Apple's warranty announcements did.

72.    When Apple's warranty announcements did little to stem the tide of unlock solutions being offered in the summer of 2007, Apple announced that use of Third Party Apps or

unlocking the AT&T SIM card might cause the iPhone to become unusable. At that time Apple had no reason to believe that statement was true, and, in fact, users who unlocked their iPhones or installed Third Party Apps had complete functionality. The computer community thought that Apple was intentionally spreading misinformation (known in the jargon of that community as "FUD," or "Fear, Uncertainty and Despair") to scare iPhone users into not making lawful alterations to unlock the SIM cards or lawfully installing new Third Party Apps.

> 2. **Apple's malicious destruction of iPhones and Defendants' refusal to fix them**

73.    When Apple's other efforts to prevent competition in the iPhone aftermarket failed, Apple decided to punish iPhone customers who had unlocked their phones, and to deter other iPhone purchasers from unlocking their phones in the future, by planting a malicious code in an iPhone operating system "upgrade" called Version 1.1.1 that damaged or destroyed the handsets of iPhone customers who had unlocked a SIM card or installed a Third Party App.

74.    Apple acted deliberately and intentionally to destroy the iPhones of consumers who had lawfully unlocked their iPhones. Apple's willful destruction is revealed by a press release Apple issued on September 24, 2007 (the "September 24 Press Release"), three days before it released Version 1.1.1.

75.    The September 24 Press Release stated:

> Apple has discovered that many of the unauthorized iPhone unlocking programs available on the Internet cause irreparable damage to the iPhone's software, *which will likely result in the modified iPhone becoming permanently inoperable when a future Apple-supplied iPhone software update is installed.* ... Apple strongly discourages users from installing unauthorized unlocking programs on their iPhones. Users who make unauthorized modifications to the software on their iPhone violate their iPhone software licensing agreement and void their warranty. *The permanent inability to use an iPhone due to installing unlocking software is not covered under the iPhone's warranty.*

(emphases added)

19

76.    Before September 24, 2007, few if any iPhone users reported any problems resulting from unlocking their iPhones, much less the handsets "bricking" or otherwise becoming "permanently inoperable." Yet Apple was able to predict in its September 24 Press Release that such problems would begin to occur *after* Version 1.1.1 was released. Apple's statement that the existence of unlock codes would "*likely result in the modified iPhone becoming permanently inoperable when a future Apple-supplied iPhone software update is installed*" unambiguously evidences that Apple *knew* Version 1.1.1 contained codes that would brick unlocked iPhones.

77.    Moreover, Apple's attempt in the September 24 Press Release to blame the "unlocking software" for the "permanent inability to use an iPhone" was a deliberately deceptive act because Apple knew it was the installation of Version 1.1.1, and not the installation of unlocking programs themselves, that would disable the iPhones.

78.    Apple's premeditated effort to disclaim warranty liability for damage that Apple knew it would itself cause to iPhones is also a deceptive act and a breach of Apple's warranty.

79.    Apple issued Version 1.1.1 on September 27, 2007. Apple had announced its operating software update was intended to make limited specific changes and improvements, including, in particular, a needed and substantial improvement to the power management and battery life of iPhone. However, instead of delivering a "patch" program altering only those specific portions of the program, Apple's upgrade was a complete new operating system that not only incorporated the improvements but also changed certain codes that were used by Third Party Apps and changed the codes necessary for the unlocked SIM cards to function.

80.    As a result of these changes, none of which were technically required for the publicly stated purposes of the upgrade but were designed solely to advance Apple's unlawful anticompetitive purposes and conduct, existing Third Party Apps were rendered useless and

20

existing SIM cards that were unlocked became re-locked. As Apple had planned and predicted three days earlier, in many cases the iPhones of customers who had unlocked their SIM cards or downloaded Third Party Apps were "bricked" and rendered useless when they unsuspectingly downloaded Version 1.1.1 containing Apple's secretly planted malicious codes.

81.    Both Apple and AT&T have breached their warranties by refusing to repair or replace iPhones that were damaged or rendered useless by Version 1.1.1. Apple and AT&T have also engaged in unfair and deceptive acts and practices by falsely asserting that the iPhone customer violated their licensing contracts with Apple by downloading Program Unlocks and that the customers were therefore themselves responsible for the damage to their phones.

82.    When confronted with the question of what remedy iPhone purchasers had for disabled iPhones, an Apple spokesman was quoted as saying "they can buy a new iPhone."

83.    In sum, the September 24 Press Release and surrounding circumstances reveal that Apple plainly intended to punish iPhone owners who had lawfully unlocked their iPhones by damaging their phones through Version 1.1.1 and then by unlawfully disclaiming warranty liability for the damage that Apple knew it had itself caused.

84.    Apple and AT&T's conduct was and continues to be patently illegal, and Apple and AT&T should be held fully liable, and punished, for their actions.

## CLASS ALLEGATIONS

85.    Plaintiff brings this action as a class action on behalf of himself and all others similarly situated for the purpose of asserting claims alleged in this Complaint on a common basis. Plaintiff's first proposed class (hereinafter the "Nationwide Class") is defined under Federal Rules of Civil Procedure 23(b)(2) and (3), and he proposes to act as a representative of the following class comprised of:

21

All persons, exclusive of the Defendants and their employees, who purchased an iPhone from Apple or AT&T anywhere in the United States between June 29, 2007 (or the actual date that the iPhone became available) through such time in the future when the effects of Defendants' violations of the federal antitrust laws and the Magnuson-Moss Warranty Act, and Apple's trespass to chattels, as alleged herein have ceased.

86.    Plaintiff's second proposed class (hereinafter the "Consumer Protection Class") is defined under Federal Rules of Civil Procedure 23(b)(2) and (3), and he proposes to act as a representative of the following class comprised of:

All persons, exclusive of the Defendants and their employees, who purchased an iPhone from Apple or AT&T in any of the 44 jurisdictions identified in Count VI herein between June 29, 2007 (or the actual date that the iPhone became available) through such time in the future when the effects of Defendants' unfair and deceptive acts and practices alleged herein have ceased.

87.    The Classes for whose benefit this action is brought are so numerous that joinder of all members is impractical.

88.    Plaintiff is unable to state the exact number of class members without discovery of the Defendants' records but, on information and belief, states that more than 1,000,000 iPhones have already been sold and that Defendants expect several million more to be sold over the ensuing several months.

89.    There are questions of law and fact common to the Classes which predominate over any questions affecting only individual members. The common questions of law and fact affecting the rights of all members of the Classes include the following:

a.    Whether either Defendant failed adequately to disclose to consumers the fact that the iPhones would be locked to only accept AT&T SIM cards;

b.    Whether either Defendant failed adequately to disclose to consumers the fact that they would not provide consumers with the unlock codes for their iPhones so that the iPhones could be used with non-AT&T SIM cards;

22

c.      Whether either Defendant failed adequately to disclose to consumers the fact that excessive data roaming charges would apply if iPhones are taken abroad;

d.      Whether either Defendant failed adequately to disclose to consumers that Apple would seek to prohibit iPhone owners from downloading Third Party Apps;

e.      Whether either Defendant failed adequately to disclose to consumers that Apple's Version 1.1.1 would disable any Third Party Apps and SIM card unlocks or would render iPhones that contained such features inoperable;

f.      Whether Defendants' conduct in locking the iPhone to only work with AT&T SIM cards is a deceptive act and practice that violates the consumer protection statutes;

g.      Whether Defendants' refusal to give consumers the unlock code for the their iPhone is a deceptive act and practice that violates the consumer protection statutes;

h.      Whether Defendants' conduct in failing adequately to disclose to consumers the fact that excessive data roaming charges apply when the iPhone is taken abroad is a deceptive act and practice that violates the consumer protection statutes;

i.      Whether Defendants' conduct in failing adequately to disclose to consumers that Apple would seek to prohibit iPhone owners from downloading Third Party Apps is a deceptive act and practice that violates the consumer protection statutes;

j.      Whether Defendants' failure adequately to disclose to consumers that Apple's Version 1.1.1 would disable any Third Party Apps and SIM card unlocks or would render iPhones that contained such features inoperable is a deceptive act and practice that violates the consumer protection statutes;

k.      Whether Apple's design and issuance of Version 1.1.1 containing undisclosed malicious codes that disabled Third Party Apps and SIM card unlocks and rendered iPhones that contained such features inoperable is a deceptive act and practice that violates the consumer protection statutes

l.      Whether Apple's destruction of iPhones and disabling of Third Party Apps and SIM card unlocks through issuance of Version 1.1.1 breached express and implied warranties of fitness and violated the Magnuson-Moss Warranty Act;

23

m.   Whether Defendants breached express and implied warranties of fitness and violated the Magnuson-Moss Warranty Act by refusing to repair or replace iPhones that had been destroyed when their owners downloaded Version 1.1.1;

n.   Whether Apple violated section 2 of the Sherman Act, 15 U.S.C. § 2, by monopolizing or attempting to monopolize the aftermarket for iPhone software applications;

o.   Whether Defendants violated section 2 of the Sherman Act, 15 U.S.C. § 2, by monopolizing, attempting to monopolize or conspiring to monopolize the aftermarket for iPhone wireless voice and data services; and

p.   Whether Apple is liable for common law trespass to chattels for damaging or destroying iPhones when it issued Version 1.1.1.

90.   Each of these enumerated commons questions of law and fact is identical for each and every member of the Classes.

91.   Plaintiff is a member of the Classes he seeks to represent, and his claims arise from the same factual and legal basis as those of the Classes; he asserts the same legal theories as do all Class members.

92.   Plaintiff will thoroughly and adequately protect the interests of the Classes, having obtained qualified and competent legal counsel to represent himself and those similarly situated.

93.   The prosecution of separate actions by individual class members would create a risk of inconsistent adjudications and would cause needless expenditure of judicial resources.

94.   Plaintiff is typical of the Classes in that his claims, like those of the Classes, are based on the same unconscionable business practices, the same uniform omissions of material facts and the same legal theories.

95.   Defendants have acted on grounds generally applicable to the Classes.

24

96.     A class action is superior to all other available methods for the fair and efficient adjudication of the controversy.

## COUNT I

### Unlawful Monopolization in Violation of Sherman Act § 2
### (Seeking Damages and Equitable Relief against Defendant Apple)

97.     Plaintiffs reallege and incorporate paragraphs 1 through 96 above as if set forth fully herein.

98.     The iPhone is a unique, premium priced product that generates a unique aftermarket for services and applications that can be used only on iPhones. The price of iPhones is not responsive to an increase in iPhone service or application prices because (a) consumers who purchase an iPhone cannot at the point of sale reasonably or accurately inform themselves of the "lifecycle costs" (that is, the combined cost of the handset and its required services, parts and applications over the iPhone's lifetime), and (b) consumers are "locked into" the iPhone due to its high price tag and would incur significant costs to switch to another handset. The aftermarket for iPhone services and applications is thus an economically distinct product market, and the service and application products that are sold within that market have no acceptable substitutes. The geographic iPhone aftermarket is national.

99.     The aftermarket for iPhone services and applications have at least two analytically distinct sub-markets – (a) the aftermarket for wireless voice and data services (the "Voice and Data Services Aftermarket"), and (b) the aftermarket for software applications that can be downloaded on the iPhone for managing such functions as ring tones, instant messaging, photographic capability and Internet applications (the "Applications Aftermarket").

25

100.    Defendant Apple has acquired monopoly power in the iPhone Applications Aftermarket through unlawful willful acquisition or maintenance of that power. Specifically, Apple has unlawfully acquired monopoly power by (i) "approving" only applications that generate revenues for Apple; (ii) discouraging iPhone customers from using competing applications by spreading misinformation; and (iii) programming Version 1.1.1 of the iPhone operating system in a way that disabled all competitors' applications and/or destroyed the iPhones of users that had downloaded competitors' applications.

101.    Apple's unlawful acquisition of monopoly power has reduced output and competition and resulted in increased prices for products sold in the iPhone Applications Aftermarket and, thus, harms competition generally in that market.

102.    Plaintiffs have been injured in fact by Apple's unlawful monopolization because they have (a) been deprived of lower cost alternatives for applications, (b) been forced to pay higher prices for Apple "approved" applications, and/or (c) had their iPhones destroyed.

103.    Apple's unlawful monopolization of the iPhone Applications Aftermarket violates Section 2 of the Sherman Act, 15 US.C. § 2, and its unlawful monopolization practices are continuing and will continue unless they are permanently enjoined.  Plaintiffs and members of the Nationwide Class have suffered economic injury to their property as a direct and proximate result of Apple's unlawful monopolization, and Apple is therefore liable for treble damages, costs and attorneys' fees in amounts to be proved at trial.

## COUNT II

### Attempted Monopolization in Violation of Sherman Act § 2
### (Seeking Damages and Equitable Relief against Defendant Apple)

104.    Plaintiffs reallege and incorporate paragraphs 1 through 103 above as if set forth fully herein.

105.    Defendant Apple has engaged in exclusionary, predatory and anticompetitive conduct with a specific intent to monopolize the iPhone Applications Aftermarket. Specifically, Apple has attempted unlawfully to acquire monopoly power by (i) "approving" only applications that generate revenues for Apple; (ii) discouraging iPhone customers from using competing applications by spreading misinformation; and (iii) programming Version 1.1.1 of the iPhone operating system in a way that disabled all competitors' applications and/or destroyed the iPhones of users that had downloaded competitors' applications. Apple did not have a legitimate business justification for any of these actions.

106.    Apple's anticompetitive actions have created a dangerous probability that Apple will achieve monopoly power in the Applications Aftermarket because Apple has already unlawfully achieved an economically significant degree of market power in that market and has effectively foreclosed new and potential entrants from entering the market or gaining their naturally competitive market shares.

107.    Apple's attempted acquisition of monopoly power has reduced output and competition and resulted in increased prices for products sold in the iPhone Applications Aftermarket and, thus, harms competition generally in that market.

27

108.    Plaintiffs have been injured in fact by Apple's attempted monopolization because they have (a) been deprived of lower cost alternatives for applications, (b) been forced to pay higher prices for Apple "approved" applications, and/or (c) had their iPhones destroyed.

109.    Apple's attempted monopolization of the iPhone Applications Aftermarket violates Section 2 of the Sherman Act, 15 US.C. § 2, and its anticompetitive practices are continuing and will continue unless they are permanently enjoined.  Plaintiffs and members of the Nationwide Class have suffered economic injury to their property as a direct and proximate result of Apple's attempted monopolization, and Apple is therefore liable for treble damages, costs and attorneys' fees in amounts to be proved at trial.

## COUNT III

### Unlawful Monopolization in Violation of Sherman Act § 2
### (Seeking Damages and Equitable Relief against Both Defendants)

110.    Plaintiffs reallege and incorporate paragraphs 1 through 109 above as if set forth fully herein.

111.    Apple and AT&T's revenue sharing arrangement with respect to AT&T's exclusive five-year iPhone voice and data services contract renders both Defendants participants in the iPhone Voice and Data Services Aftermarket.

112.    Defendants have acquired monopoly power in the iPhone Voice and Data Services Aftermarket through unlawful willful acquisition or maintenance of that power. Specifically, Defendants have unlawfully acquired monopoly power by (i) discouraging iPhone customers from unlocking their SIM cards through misinformation campaigns; (ii) programming Version 1.1.1 of the iPhone operating system in a way that disabled all SIM card unlocks and/or

28

destroyed the iPhones of users that had unlocked their SIM cards; and (iii) refusing to honor the iPhone warranty for users who unlocked their SIM cards.

113.    Defendants' unlawful acquisition of monopoly power has reduced output and competition in the iPhone Voice and Data Services Aftermarket and, thus, harms competition generally in that market.

114.    Plaintiffs have been injured in fact by Defendants' unlawful monopolization because they have (a) been deprived of alternatives for voice and data services domestically, (b) been forced to pay higher prices for roaming charges while traveling internationally, and/or (c) had their iPhones destroyed.

115.    Defendants' unlawful monopolization of the iPhone Voice and Data Services Aftermarket violates Section 2 of the Sherman Act, 15 US.C. § 2, and their unlawful monopolization practices are continuing and will continue unless they are permanently enjoined. Plaintiffs and members of the Nationwide Class have suffered economic injury to their property as a direct and proximate result of Defendants' unlawful monopolization, and Defendants are therefore liable for treble damages, costs and attorneys' fees in amounts to be proved at trial.

## COUNT IV

### Attempted Monopolization in Violation of Sherman Act § 2
### (Seeking Damages and Equitable Relief against Both Defendants)

116.    Plaintiffs reallege and incorporate paragraphs 1 through 115 above as if set forth fully herein.

117.    Defendants have engaged in exclusionary, predatory and anticompetitive conduct with a specific intent to monopolize the iPhone Voice and Data Services Aftermarket. Specifically, Defendants have attempted unlawfully to acquire monopoly power by (i)

29

discouraging iPhone customers from unlocking their SIM cards through misinformation campaigns; (ii) programming Version 1.1.1 of the iPhone operating system in a way that disabled all SIM card unlocks and/or destroyed the iPhones of users that had unlocked their SIM cards; and (iii) refusing to honor the iPhone warranty for users who unlocked their SIM cards. Defendants did not have a legitimate business justification for any of these actions.

118.    Defendants' anticompetitive actions have created a dangerous probability that they will achieve monopoly power in the Voice and Data Services Aftermarket because Defendants have already unlawfully achieved an economically significant degree of market power in that market and have effectively foreclosed new and potential entrants from entering the market or gaining their naturally competitive market shares.

119.    Defendants' attempted acquisition of monopoly power has reduced output and competition and resulted in increased prices for products sold in the iPhone Voice and Data Services Aftermarket and, thus, harms competition generally in that market.

120.    Plaintiffs have been injured in fact by Defendants' attempted monopolization because they have (a) been deprived of alternatives for voice and data services domestically, (b) been forced to pay higher prices for roaming charges while traveling internationally, and/or (c) had their iPhones destroyed.

121.    Defendants' attempted monopolization of the iPhone Voice and Data Services Aftermarket violates Section 2 of the Sherman Act, 15 US.C. § 2, and their anticompetitive practices are continuing and will continue unless they are permanently enjoined. Plaintiffs and members of the Nationwide Class have suffered economic injury to their property as a direct and proximate result of Defendants' attempted monopolization, and Defendants are therefore liable for treble damages, costs and attorneys' fees in amounts to be proved at trial.

## COUNT V

### Conspiracy to Monopolize in Violation of Sherman Act § 2
### (Seeking Damages and Equitable Relief against Both Defendants)

122.     Plaintiffs reallege and incorporate paragraphs 1 through 121 above as if set forth fully herein.

123.     Defendants have knowingly and intentionally conspired among themselves with the specific intent to monopolize the iPhone Voice and Data Services Aftermarket. In furtherance of the conspiracy, Defendants have committed one or more of the following acts: (i) discouraging iPhone customers from unlocking their SIM cards through misinformation campaigns; (ii) programming Version 1.1.1 of the iPhone operating system in a way that disabled all SIM card unlocks and/or destroyed the iPhones of users that had unlocked their SIM cards; and (iii) refusing to honor the iPhone warranty for users who unlocked their SIM cards. Defendants did not have a legitimate business justification for any of these actions.

124.     Defendants have already unlawfully achieved an economically significant degree of market power in the Data Services Aftermarket as a result of their conspiracy and have effectively foreclosed new and potential entrants from entering the market or gaining their naturally competitive market shares.

125.     Defendants' conspiracy has reduced output and competition and resulted in increased prices for products sold in the iPhone Voice and Data Services Aftermarket and, thus, harms competition generally in that market.

126.     Plaintiffs have been injured in fact by Defendants' conspiracy because they have (a) been deprived of alternatives for voice and data services domestically, (b) been forced to pay

31

higher prices for roaming charges while traveling internationally, and/or (c) had their iPhones destroyed.

127.    Defendants' conspiracy to monopolize the iPhone Voice and Data Services Aftermarket violates Section 2 of the Sherman Act, 15 U.S.C. § 2, and their anticompetitive practices are continuing and will continue unless they are permanently enjoined.  Plaintiffs and members of the Nationwide Class have suffered economic injury to their property as a direct and proximate result of Defendants' conspiracy, and Defendants are therefore liable for treble damages, costs and attorneys' fees in amounts to be proved at trial.

### COUNT VI

#### Unfair and Deceptive Acts and Practices
#### (Seeking Damages and Equitable Relief against Both Defendants)

128.    Plaintiffs reallege and incorporate paragraphs 1 through 127 above as if set forth fully herein.

129.    The consumer protection and unfair and deceptive trade practices laws of 44 jurisdictions in the United States prohibit deceptive acts or practices in the conduct of any business trade or commerce or in the furnishing of any service[5] and authorize a private right of action against defendants that violate those laws.

---

[5] The state statutes Defendants are alleged to have violated are: **Alaska** (Alaska Stat. §§ 45.50.471 *et seq.*); **Arizona** (Ariz. Rev. Stat. § 44-1522); **Arkansas** (Ark. Code. §§ 4-88-107 and 4-88-108); **California** (Cal. Civ. Code § 1770(a)(19) and Cal. Bus. & Prof. Code §§ 17200 and 17500); **Colorado** (Colo. Rev. Stat. § 6-1-105(u)); **Connecticut** (Conn. Gen. Stat. § 42-110(b); **Delaware** (6 Del. Code § 2513); **District of Columbia** (D.C. Code § 28-3904(e),(f)); **Florida** (F.S.A. § 501.204)); **Hawaii** (Haw. Rev. Stat. § 480-2(a)); **Idaho** (Idaho Code § 48-603(17),(18)); **Illinois** (815 Ill. Comp. Stat. 505/2); **Indiana** (Ind. Code § 24-5-0.5-3(a)); **Kansas** (Kan. Stat. §§ 50-626(a),(b) and 50-627(a)); **Kentucky** (Ky. Rev. Stat. § 367.170); **Maine** (Me. Rev. Stat. tit. 5, § 207); **Maryland** (Md. Code Com. Law § 13-301(1),(3)); **Massachusetts** (Mass. Gen. Laws ch. 93A, §§ 2(a) and 9); **Michigan** (Mich. Stat. § 445.903(1)(s),(bb),(cc));

32

130.   Defendants sold iPhones to consumers in these 44 jurisdictions without disclosing the fact (a) that the handsets had been locked to only work with AT&T SIM cards; (b) that Defendants would not provide the unlock code to consumers; (c) that consumers would incur substantial roaming fees for the use of the iPhone's data features while traveling internationally; (d) that Apple would seek to prohibit iPhone owners from downloading Third Party Apps; (e) that Apple had embedded malicious codes within Version 1.1.1 that would disable any SIM card unlocks or Third Party Apps and/or "brick" any iPhone that had been unlocked or had Third Party Apps installed; and (f) that Defendants would refuse to honor the iPhone warranty or repair or replace iPhones that had been destroyed when their owners downloaded Version 1.1.1.

131.   Defendants' conduct described above is deceptive and misleading in material respects. Defendants, to the extent required under the laws of any jurisdiction, have made misrepresentations and acted unconscionably in connection with the marketing and sale of Apple iPhones and related aftermarket services, including AT&T's iPhone voice and data service plans.

132.   Defendants' acts and practices described above are likely to mislead a reasonable consumer acting reasonably under the circumstances.

---

Minnesota (Minn. Stat. §§ 8.31 and 325F.67 and 325F.69(1)); **Missouri** (Mo. Rev. Stat. § 407.020); **Nebraska** (Neb. Rev. Stat. § 59-1602); **Nevada** (NRS 598-0915(5),(15) and 598.0923(2)); **New Hampshire** (N.H. Rev. Stat. § 358-A:2); **New Jersey** (N.J.S.A. § 56:8-2); **New Mexico** (N.M.S.A. §§ 57-12-2(14),(17) and 57-12-3); **New York** (N.Y. Gen. Bus. Law § 349); **North Carolina** (N.C. Gen. Stat. §§ 75-1.1); **North Dakota** (N.D. Cent. Code §§ 51-15-02); **Ohio** (Ohio Rev. Code §§ 1345-02(A) and 1345-03(A) and 4165.02(7),(11) and §4165.03); **Oklahoma** (Okla. Stat. tit. 15, §§ 752 and 733 and tit. 78, § 53(9)); **Oregon** (Or. Rev. Stat. §§ 646.607(1) and 646.608(1)(i),(t),(u) and 646.608(2)); **Pennsylvania** (73 P.S. §201-2(1)(ix), 201-2(4)(xiv)); **Rhode Island** (R.I. Gen. Laws §§ 6-13.1-1(6)(ix),(xiii),(xiv) and 6-13.1-2); **South Dakota** (S.D. Codified Laws § 37-24-6(1)); **Tennessee** (Tenn. Code Ann. § 47-18-104(a)); **Texas** (Tex. Bus. & Com. Code Ann. §§ 17.46(b)(9),(24) and 17.50); **Utah** (UCA 1953 §§ 13-11-4(1) and 13-11-5(1)); **Vermont** (Vt. Stat. Ann. tit. 9, § 2453(a)); **Virginia** (Va. Code Ann. § 59.1-200(8),(14)); **Washington** (RCWA §§ 19.86.020 and 19.86.920); **West Virginia** (W.Va. Code §§ 46A-6-102(b)(I),(L),(M) and 46A-6-104); **Wisconsin** (W.S.A. §§ 100.18 and 100.195 and 100.20 and 100.207); and **Wyoming** (WS § 40-12-105(a)(x),(xv)).

33

133.    As a result of the Defendants' deceptive and misleading acts, Plaintiff and class members have been injured.  To the extent necessary under the laws of any jurisdiction, Plaintiff has provided Defendants with notice and an opportunity to cure their misleading and deceptive acts and practices and have sought to settle and resolve this dispute.

134.    Defendants' conduct violates the consumer protection and unfair and deceptive acts and practices laws of each of the 44 jurisdictions at issue, and their deceptive acts and practices are continuing and will continue unless they are permanently enjoined.  Plaintiff and members of the Consumer Protection Class have suffered injury as a direct and proximate result of Defendants' conduct, and Defendants are liable for compensatory and treble or other punitive damages, costs and attorneys' fees as each respective jurisdiction may permit, in amounts to be proved at trial.

## COUNT VII

### Violation of the Magnuson-Moss Warranty Act
**(Seeking Damages and Equitable Relief against Both Defendants)**

135.    Plaintiffs reallege and incorporate paragraphs 1 through 134 above as if set forth fully herein.

136.    Defendant Apple violated the iPhone warranty under the Magnuson-Moss Warranty Act ("MMWA") by conditioning its written and implied warranties of that product on consumers using, in connection with such product, articles or services (other than articles or services provided without charge under the terms of the warranty), which are identified by brand, trade, or corporate name, including AT&T's voice and data service and the software applications "approved" by Apple.

34

137.    Defendants Apple and AT&T violated the iPhone warranty under the MMWA by not fully and conspicuously disclosing the characteristics or properties of the products, or parts thereof, that are not covered by the warranty, namely, by not fully and conspicuously disclosing that they would not honor the warranty as to iPhones that were damaged and destroyed by Apple's Version 1.1.1 operating system upgrade.

138.    Plaintiff has provided Defendants with reasonable notice and an opportunity to cure their breaches of warranty and MMWA violations.

139.    Defendants' breaches of warranty and MMWA violations are continuing and will continue unless they are permanently enjoined. Plaintiff and members of the Nationwide Class have suffered actual damages as a direct and proximate result of Defendants' breaches of warranty and MMWA violations, and Defendants are liable for compensatory damages and costs in amounts to be proved at trial.

## COUNT VIII

### Trespass to Chattels
### (Seeking Damages and Equitable Relief against Apple)

140.    Plaintiffs reallege and incorporate paragraphs 1 through 139 above as if set forth fully herein.

141.    Apple's conduct in causing Version 1.1.1 of its operating software to (a) damage or brick iPhones; (b) disable existing SIM card unlocks; (c) disable existing Third Party Apps; (d) alter the product owned by Plaintiff and the class members to create technological impediments to unlocking SIM cards; and (e) alter the product owned by Plaintiff and the class members to create technological impediments to the purchase of Third Party Apps, were

35

alterations that Plaintiff and the class members did not want nor invite, and they were not made with any purpose other than to benefit Apple in continuing its unlawful conduct described above.

142.    Apple's unwanted and uninvited intermeddling with the iPhone operating software is an actual or intended trespass to property owned by Plaintiff and each class member.

143.    Apple acted knowingly, willfully and maliciously, and with reckless, callous and criminal indifference to and disregard for the rights of others.

144.    Defendant's trespass is continuing and will continue unless Apple is permanently enjoined.  Plaintiff and members of the Nationwide Class have suffered injury as a direct and proximate result of Apple's conduct, and Apple is liable for compensatory and punitive damages and costs in amounts to be proved at trial.

**WHEREFORE**, Plaintiff respectfully requests that the court enter judgment against the Defendants as follows:

a.    Permanently enjoining Defendants from damaging and destroying iPhones through software updates or otherwise;

b.    Ordering Defendants to repair or replace, at no cost to the consumer, all iPhones Defendants have damaged or destroyed;

c.    Permanently enjoining Defendants from selling locked iPhones that can only be used with AT&T SIM cards unless such information is adequately disclosed to consumers prior to sale;

d.    Ordering Defendants to provide the unlock code upon request to all members of the Classes who purchased an iPhone prior to the disclosures described above;

e.    Ordering Defendants to adequately disclose the extent to which fees are charged for taking or using iPhones while traveling abroad;

36

f.   Permanently enjoining Apple from monopolizing or attempting to monopolize the iPhone Applications Aftermarket;

g.   Permanently enjoining Defendants from monopolizing, attempting to monopolize and conspiring to monopolize the iPhone Voice and Data Services Aftermarket;

h.   Awarding Plaintiff and the Nationwide Class treble damages for injuries caused by Defendants' violations of the federal antitrust laws;

i.   Permanently enjoining Defendants from engaging in unfair and deceptive practices with respect to iPhones in violation of the consumer protection statutes;

j.   Awarding Plaintiff and the Consumer Protection Class compensatory and punitive damages for injuries caused by Defendants' deceptive acts and practices;

k.   Permanently enjoining Defendants from violating the Magnuson-Moss Warranty Act and breaching their express and implied warranties of fitness;

l.   Awarding Plaintiff and the Nationwide Class compensatory damages for injuries caused by Defendants' violations of the Magnuson-Moss Warranty Act and breaches of their express and implied warranties of fitness;

m.   Permanently enjoining Apple from trespassing on class members' iPhones through future software updates or otherwise;

n.   Awarding Plaintiff and the Nationwide Class compensatory and punitive damages for Apple's trespass to chattels;

o.   Award Plaintiff and the classes reasonable attorneys' fees and costs; and

p.   Granting such other and further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

37

Dated:  New York, New York
        November 16, 2007

                            WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP

                            By: _____

                                Mark C. Rifkin (MR-0904)
                                Alexander H. Schmidt (AS-8304)
                                Martin E. Restituyo (MR-0856)
                            270 Madison Avenue
                            New York, New York 10016
                            (212) 545-4600

                            Randall S. Newman (RN-7862)
                            Randall S. Newman, P.C.
                            The Trump Building
                            40 Wall Street, 61st Floor
                            New York, New York 10005
                            (212) 797-3737

                            Stephen P. DeNittis
                            Norman Shabel
                            *Pro Hac Vice Application Pending*
                            Shabel & DeNittis, P.C.
                            5 Greentree Centre, Suite 302
                            Marlton, New Jersey 08053
                            (856) 797-9951

                            *Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

HERBERT H. KLIEGERMAN, on behalf of
himself and others similarly situated,

07-cv-08404-PKC

Plaintiff,

- against -

**CERTIFICATE OF SERVICE**

APPLE, INC. and AT&T MOBILITY, LLC,

Defendants.

---

I, Alexander H. Schmidt, an attorney at law admitted in this State, hereby certify that on this 16th day of November, 2007, I have caused a true copy of the Amended Class Action Complaint, filed today, to be delivered by overnight mail to:

**LATHAM & WATKINS, LLP**
Hanno F. Kaiser
855 Third Avenue
New York, New York 10036
(212) 906-1200
**Counsel for Defendant**
**Apple, Inc.**

**AT&T MOBILITY LLC**
Neil Berinhout
5565 Glenridge Connector, Suite 1700
Atlanta, Georgia 30342
(courtesy copy)
**Counsel for Defendant**
**AT&T Mobility, LLC**

Alexander H. Schmidt (AS-8304)

# EXHIBIT 4

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles R. Norgle | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 04 C 6875 | **DATE** | 5/3/2005 |
| **CASE TITLE** | Smith vs. AON | | |

**DOCKET ENTRY TEXT:**

The Kahn ERISA Plaintiff Group's Motions for Consolidation [17-1] and Appointment of Interim Class Counsel [17-2] are granted.

■[ For further details see text below.]                    Docketing to mail notices.

---

### STATEMENT

Plaintiffs are participants in, and beneficiaries of, Defendant AON Corporation's 401(k) savings plan (the "Plan"). Plaintiffs allege that AON, and its corporate directors and officers, breached their fiduciary duties to Plaintiffs by mishandling the Plan's holdings of AON stock. As a result of Defendants' breach of their fiduciary duties, Plaintiffs allege, Plaintiffs have suffered significant financial losses. Plaintiffs have filed a number of actions against Defendants, alleging violations of the Employee Retirement Income Security Act ("ERISA"). Plaintiffs have filed these actions on their own behalf, and on behalf of other members of a proposed Class of Plaintiffs.

Plaintiffs Sheryl Kahn, James T. Kayfes, Jr., Alan Lubeck, James P. Fagan, Mary A. Brewton, and Gil McDonald (the "Kahn ERISA Plaintiff Group,") now move the court to consolidate twelve separate but related actions (and any subsequently-filed related ERISA cases filed in, removed to, or transferred to this court) pursuant to Federal Rule of Civil Procedure 42(a), and to appoint the law firm of Wolf Haldenstein Adler Freeman and Herz ("Wolf") as Interim Lead Class Counsel pursuant to Federal Rule of Civil Procedure 23(g). For the following reasons, these Motions are granted.

**A. Consolidation**

The purpose of consolidating actions together is to promote convenience and judicial economy. Johnson v. Manhattan Railway Co., 289 U.S. 479, 496-97 (1973). Consolidation of cases is encouraged where common questions of fact or law are present. 9 Wright & Miller's FED. PRAC. AND PROC. CIV., 2d § 2383. Cases may be consolidated pursuant to Federal Rule of Civil Procedure 42. That Rule provides, in part, "When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay." FED. R. CIV. P. 42(a).

The court finds that consolidation is appropriate in this case. These cases clearly involve "common questions of law or fact": whether Defendant's conduct in relation to the Plan's holding of AON stock

## STATEMENT

breached Defendants' fiduciary duties to Plaintiffs, and violated any ERISA provisions. The interests of convenience and judicial economy will be served by consolidating these cases. See Johnson, 289 U.S. at 496-97. Cases numbered 04 C 6875, 04 C 6965, 04 C 7046, 04 C 7048, 04 C 7118, 04 C 7119, 04 C 7122, 04 C 7190, 04 C 7295, 04 C 7650, 04 C 7651, 04 C 7673, and all subsequently-filed related ERISA cases filed in, removed to, or transferred to this court, shall therefore be consolidated into Master Docket number 04 C 6875.[1] This case shall be captioned "In Re AON ERISA Litigation."

### B. Interim Lead Class Counsel

Pursuant to Federal Rule of Civil Procedure 23(g)(2)(A), the court may "designate interim counsel to act on behalf of the putative class before determining whether to certify the action as a class action." In determining who should act as Class Counsel, the overriding precept is that the court must appoint class counsel who will "fairly and adequately represent the interests of the class." FED R.CIV. P. 23 (g)(1)(B). In making this determination, the court must consider the following factors:

"the work counsel has done in identifying or investigating potential claims in the action, counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action, counsel's knowledge of the applicable law, and the resources counsel will commit to represent the class."

Id. at (g)(1)(C)(i). In addition, the court "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Id. at (g)(1)(C) (ii). In short, the court has a responsibility to "appoint class counsel who will provide the adequate representation [for class members] called for by paragraph (1)(B)." Id. at (g)(1)(C) advisory committee's note.

In this case, Wolf meets these criteria. Wolf has committed considerable time and resources into investigating these claims. Wolf is experienced in handling complex, large-scale class actions. Wolf's Class Action Litigation Group consists of thirty attorneys experienced in complex class action suits involving, inter alia, ERISA matters, and the conduct of corporate officers. While lead counsel, Wolf has settled numerous class actions, resulting in recoveries of up to $715 million for class members. In addition, Wolf is a large firm, with offices in New York, Chicago, San Diego, and West Palm Beach. Wolf thus has the resources necessary to adequately represent the putative class members in this case.

Moreover, Wolf, as a single firm, would be able to provide streamlined, efficient representation to the class. A competing group of Plaintiffs (the "Smith Group") proposes that a multi-layered conglomeration of six law firms act as Class Counsel in this matter. Such an arrangement would surely result in bureaucratic entanglements that would hamper the efficient representation of the class. In fact, bureaucratic wrangling amongst these firms seems already to have begun, as one of those six firms, Miller Faucher and Cafferty LLP has split from the Smith Group, and filed its own motion to be appointed Class Counsel. The court has a responsibility to avoid subjecting class members to inefficient representation. See FED R.CIV. P. 23 (g)(1)(B). Wolf presents itself as a single, experienced, competent firm with a local office, and the resources necessary to effectively represent the class members in this case. The court therefore appoints Wolf as Interim Lead Class Counsel in this matter.

---

1. The court notes that it has already determined that a number of these cases were "related," pursuant to Local Rule 40.4. See Minute Order of December 20, 2004.

# EXHIBIT 5

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

FILED BY _____ D.C.

05 FEB -7 PM 2: 44

ROBERT R. DI TROLIO
CLERK, U.S. DIST. CT.
W.D. OF TN, MEMPHIS

| | |
|---|---|
| AMERICAN COPPER & BRASS, INC., on behalf of itself and all others similarly situated,<br><br>               **Plaintiff,**<br><br>v.<br><br>BOLIDEN AB, et al.,<br><br>               **Defendants.** | **CIVIL ACTION NO. 04-2771 - DV**<br>**Honorable Judge Bernice B. Donald**<br>**Magistrate Judge Diane K. Vescovo** |
| THE BANKRUPT ESTATE OF SMITH AND WOFFORD PLUMBING AND INDUSTRIAL SUPPLY, INC. on behalf of itself and all others similarly situated,<br><br>               **Plaintiff,**<br><br>v.<br><br>BOLIDEN AB, et al.,<br><br>               **Defendants.** | **CIVIL ACTION NO. 04-2930-DV**<br>**Honorable Judge Bernice B. Donald**<br>**Magistrate Judge Diane K. Vescovo** |

## AMENDED [PROPOSED] ORDER TO APPOINT PLAINTIFFS'
## CO-LEAD COUNSEL, CO-LIAISON COUNSEL, AND CONSOLIDATE CASES

This matter is before the Court upon the respective applications of American Copper & Brass, Inc., and The Estate of Smith and Wofford Plumbing and Industrial Supply, Inc., for appointment of interim Lead and Liaison Counsel for the Plaintiff Class. Pursuant to Rule 23(g), the Court has reviewed the submissions of the parties. Since those filings, the parties have reached an agreement regarding a workable lead counsel arrangement, as evidenced by the joint motion filed by the Plaintiffs on February 3, 2005. Therefore the Court hereby Orders as follows:

1

This document entered on the docket sheet in compliance with Rule 58 and/or 79(a) FRCP on _2-38-05_



1.     The law firms of Wolf Haldenstein, Adler, Freeman and Hertz, LLP, and Alexander,

Hawes & Audet, LLP, both have significant experience in handling complex class actions and

prosecuting similar claims for class members in other cases.  Additionally, the Bramlett Law Offices

and the firm of Glassman, Edwards, Wade & Wyatt, PC, are well versed in local law and are located

in Tennessee.   The firms together can adequately represent the interests of the proposed class.

Accordingly, for the reasons set forth above and for other reasons, the parties stipulate and the Court

finds and determines that Alexander, Hawes & Audet and the Wolf Haldenstein firm will serve as

Interim Co-Lead Counsel and the Bramlett Law Offices and Glassman, Edwards, Wade & Wyatt, PC,

will serve as Interim Co-Liaison Counsel.

2.     The following actions are hereby consolidated for all purposes, including pretrial

proceedings, trial and appeal, pursuant to Rule 42 of the Federal Rules of Civil Procedure:

| Abbreviated Case Name | Case Number | Date Filed |
|---|---|---|
| *American Copper & Brass, Inc. v. Boliden AB, et al* | 04-2771 - DV | 09/24/04 |
| *The Bankrupt Estate of Smith & Wofford Plumbing & Industrial Supply, Inc. v. Boliden AB, et al* | 04-2930 - DV | 11/17/04 |

3.     The caption of these consolidated actions shall be "*In re: Copper Tubing Litigation*"

and the files of these consolidated actions shall be maintained in one file under Master File No. 04-

2771 - DV.  Any other actions now pending or later filed in this Court which arise out of or are

related to the same facts as alleged in the above-identified cases shall be consolidated for all

purposes, if and when they are brought to the Court's attention.

4.     Every pleading filed in the consolidated actions, or in any separate action included

2

herein, shall bear the following caption:

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | |
|---|---|
| ———————————————— | )Master File No. 04-2771 - DV |
| In re COPPER TUBING LITIGATION | ) |
| ———————————————— | ) |
| | ) |
| This Document Relates To: | ) |
| ———————————————— | ) |

5.     When a pleading is intended to be applicable to all actions governed by this Order, the words "All Actions" shall appear immediately after the words "This Document Relates To:" in the caption set out above. When a pleading is intended to be applicable to only some, but not all, of the consolidated actions, this Court's docket number for each individual action to which the pleading is intended to be applicable and the last name of the first-named plaintiff in said action shall appear immediately after the words "This Document Relates To:" in the caption described above (*e.g.*, "_____ (_____)").

6.     Plaintiffs, through Lead Counsel appointed by Order of this Court, shall file and serve a single consolidated complaint within 30 days after the entry of this Order. The consolidated complaint shall be deemed the original complaint, superseding all complaints filed in any of the actions consolidated hereunder or in any related cases. Defendants shall have sixty (60) days from the service of the Consolidated Complaint to answer, move, or otherwise respond to the Consolidated Complaint.

3

IT IS SO ORDERED.

*Diane K. Vescovo*

~~JUDGE BERNICE B. DONALD~~

DATE: *February 7, 2005*

4